*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0082p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

MICHAEL WHEATON,

        *Defendant-Appellant.*

No. 06-4080

>

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 05-00412—Christopher A. Boyko, District Judge.

Argued: January 29, 2008

Decided and Filed: February 19, 2008

Before: GUY, GILMAN, and McKEAGUE, Circuit Judges.

---

#### COUNSEL

**ARGUED:** Vicki L. Ward, Cleveland, Ohio, for Appellant. Samuel A. Yannucci, ASSISTANT UNITED STATES ATTORNEY, Akron, Ohio, for Appellee. **ON BRIEF:** Vicki L. Ward, Cleveland, Ohio, for Appellant. Samuel A. Yannucci, ASSISTANT UNITED STATES ATTORNEY, Akron, Ohio, for Appellee.

---

#### OPINION

---

RONALD LEE GILMAN, Circuit Judge. Michael Wheaton was convicted by a jury on one count of conspiring to distribute more than five kilograms of cocaine and of possessing the drug with the intent to distribute. He filed a motion for a new trial, alleging that a juror's use of a laptop computer in the jury room to obtain extrinsic evidence had undermined the integrity of the verdict. The district court denied Wheaton's motion, concluding that the interests of justice did not require a new trial because the information acquired by the juror had no effect on the jury's deliberations. Wheaton renews this claim on appeal, and also raises a number of other alleged trial errors that were not included in his motion for a new trial.

At the sentencing hearing, the district court, pursuant to USSG § 2D1.1(b)(1), added two levels to Wheaton's base offense level for the possession of a firearm. The court also increased Wheaton's criminal history points under USSG § 4A1.1(e), finding that Wheaton had participated in the charged conspiracy less than two years after being released from custody for another crime. After calculating the advisory Guidelines range to be 235 to 293 months' imprisonment and noting

that the statutory maximum was 240 months of imprisonment, the court sentenced Wheaton to 235 months of imprisonment and three years of supervised release.

Wheaton appeals both his conviction and his sentence. He challenges (1) the district court's failure to grant him a new trial based on juror misconduct, (2) instructions given to the jury about the credibility of certain witnesses, (3) the admission of a photograph of the firearm in question that was found near the location of his arrest, (4) the sufficiency of the evidence to support his conviction, (5) the procedural reasonableness of his sentence, including the district court's calculation of the Guidelines range, (6) the substantive reasonableness of his sentence, and (7) the fundamental fairness of his trial based on cumulative error. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.    Indictment

In August of 2005, a federal grand jury returned an indictment against Wheaton, Horace Lee Anderson, and Cortland Love. Count One of the indictment, the only count that involved Wheaton, charged Wheaton, Anderson, and Love with conspiring to distribute cocaine and possessing the drug with the intent to distribute, all in violation of 21 U.S.C. § 846. Anderson and Love both pled guilty to Count One, but Wheaton's case went to trial in February of 2006.

### B.    Trial testimony

At trial, the government set out to prove that between the fall of 2000 and November of 2004, Wheaton—who was known initially only as "Kev"—conspired to transport cocaine from California to Youngstown, Ohio, where the drugs were ultimately distributed. The government presented testimony from 14 witnesses, including federal and local law enforcement officers, a postal inspector, drug dealers, drug users, and unindicted coconspirators and accomplices, all of whom allegedly had contact with the members of the charged conspiracy. Summarized below is the key testimony against Wheaton.

#### 1.    *Jeffrey Lynn*

Jeffrey Lynn testified that between 1999 and 2001, he, his sister Jeracho Poole, and a now-deceased friend transported large quantities of marijuana from California to Youngstown, where Lynn then sold the drug to Anderson and Love. Lynn further stated that in the beginning of 2001, Anderson and Love presented him with a "business proposition for [him] to transport cocaine from California to [Ohio]." According to Lynn, Love gave Lynn the pager number for "a guy named Kev that resided in California."

Lynn stated that he subsequently spoke to Kev on the phone and arranged a meeting in California between Kev and Poole. From that point forward, Lynn claimed, Poole went to California to meet Kev two to three times a week by airplane and once or twice a month by car. Lynn further testified that when his sister brought the cocaine back to Youngstown, he would usually divide it evenly between himself, Anderson, and Love. He noted that many of the drug transactions in Youngstown took place in or around three houses—located at 926, 935, and 939 Sherwood—that Anderson owned.

In July of 2001, Poole was arrested. Lynn stated that this caused Kev to subsequently come to Youngstown, where Kev, Lynn, Anderson, and Love held a meeting at Love's house. According to Lynn, he met Kev at this meeting "for the first time face-to-face." Lynn further stated that the purpose of the meeting was to figure out how to reestablish the cocaine operation now that their main courier, Poole, could no longer participate. After the meeting, Lynn met Kev approximately

three or four times in Ohio and received somewhere between one and three kilograms of cocaine during each transaction. Lynn said that he did not have any further contact with Kev after 2002. In addition, Lynn identified Wheaton at trial as the person whom he had known as Kev.

Lynn also explained that he had begun cooperating with the government in 2002, and that because he had become an informant for the government in this and other drug cases, the government did not indict him for any of his drug-trafficking activities. He further stated that the government had spent "a couple hundred dollars" paying for his gas, cell phone bill, and other "operational expenses."

### 2.	*Jeracho Poole*

Lynn's sister, Poole, also testified at Wheaton's trial. Poole said that she first met Kev, whom she identified in the courtroom as Wheaton, in Los Angeles, California in either December of 2000 or January of 2001. On the other hand, Poole proceeded to describe a series of three trips between California and Youngstown that started sometime after her release from prison just before Thanksgiving of 2000 and ended with an automobile accident outside of Little Rock, Arkansas on December 13, 2000.

Although Poole did not ascribe specific dates to these trips, her testimony helps to establish the timeline surrounding her first encounter with Kev. She testified that her first meeting with Kev was arranged by Lynn at a time when she was already in San Diego, California for a marijuana run. Poole explained that she took the train from San Diego to Los Angeles to meet Kev, got one kilogram of cocaine from him at that time, returned to San Diego to retrieve her car and the marijuana, and took the drugs back to Lynn in Ohio. She described this trip as a test run to see whether "the thing would work out." Poole stated that she subsequently made another marijuana run to San Diego by car, during which she did not meet up with Kev. She further noted that this was the last trip she made to San Diego to pick up marijuana.

Finally, Poole explained that she made a third trip to California by car, where she obtained four kilograms of cocaine from Kev in Los Angeles before driving back to Youngstown. This trip was memorable, she explained, because she was involved in a serious car accident outside of Little Rock, Arkansas on her way back to Ohio. The government introduced into evidence a state police report from the accident, which showed that the wreck took place on December 13, 2000.

Poole further testified that she made "numerous" trips by air and car between Los Angeles and Youngstown in 2001, that she met with Kev to get cocaine (usually between four and six kilograms) every time, and that her method for contacting Kev via pager was always the same. The government introduced into evidence airline tickets showing that Poole had traveled between Ohio and Los Angeles in January of 2001. Poole was questioned about records from two of her cell phones, which showed that she had paged the entry for "Kev" on numerous occasions between January of 2001 and July of 2001. She also pointed to many instances when she received callbacks from Kev.

In July of 2001, Poole was arrested in Kansas while driving from Los Angeles to Youngtown. A little more than eight kilograms of cocaine was found in her car, in addition to maps of California and a cell phone, the data from which showed an outgoing page to Kev dated a few days prior to her arrest. Poole pled guilty to a charge of possession of cocaine and served a five-year sentence of imprisonment. While incarcerated, she began to cooperate with federal authorities, but did not receive a reduced sentence in exchange for her cooperation. Poole acknowledged, however, that in exchange for her truthful testimony before the grand jury in the present case, the government promised to not further prosecute her and to inform the court handling her brother's crack cocaine charges that she was cooperating with the government.

### 3.     *Other testimony*

In addition to Lynn and Poole, the government presented testimony from four individuals who claimed to have obtained either marijuana or cocaine from the alleged conspirators (including Lynn) during the course of the conspiracy.  The testimony from these individuals served to corroborate Lynn's and Poole's testimony about the cocaine operation and to link the Youngstown part of that operation to Anderson's three houses.

For example, Brandon McDowell testified that, at some point between 2001 and 2003, he was at 926 Sherwood when he was introduced to someone named Kev, whom he identified in the courtroom as Wheaton. McDowell further stated that, before their formal introduction, he had seen Kev at all three of Anderson's houses.  He described a conversation that he and Kev had the first time that they met.  McDowell explained that when Kev heard that McDowell was "getting a lot of dope off of" Anderson, Kev jokingly said: "well, I should just cut [Anderson] off."  Wheaton and McDowell also socialized around Youngstown on occasion, but McDowell knew him only as Kev. Finally, McDowell identified vehicles that he had seen being driven by Kev in vicinity of the Sherwood houses.

Postal Inspector Michael Rae also testified on behalf of the government.  He stated that in November of 2003 he conducted a controlled delivery of a package coming from California and addressed to Anderson at 935 Sherwood.  The package smelled of narcotics but did not contain any drugs.  When Rae arrived at 935 Sherwood posing as a postman, a man approached him from across the street, identified himself as Kevin Smith, and signed for the package.  The exchange was video and audio recorded and played for the jury while Rae was on the witness stand.  Rae subsequently identified Wheaton as the person who called himself Kevin Smith and signed for the package.

Detective Greg Coleman testified about Wheaton's arrest at 935 Sherwood on November 18, 2004, stating that he watched Wheaton pull into the driveway at 926 Sherwood and then walk across the street to 935 Sherwood.  He also testified extensively about the photographs that he took on the day of the arrest, identifying and discussing pictures of the three houses on Sherwood, the cars that were found parked at each of the residences, the drug-related items found at 935 and 939 Sherwood, and the handgun found under a couch cushion at 926 Sherwood.  Wheaton's attorney objected to the admission of the photograph of the handgun, but the district court admitted the photograph with a limiting instruction.

The government also presented testimony from other local and federal law enforcement officials.  These individuals testified about a variety of matters, including the ongoing investigation of the charged conspiracy, the day of Wheaton's arrest at 935 Sherwood, two traffic stops in or around Youngstown during which Wheaton presented police officers with a California driver's license with his own name on it and stated that he was from Los Angeles, a canine certified in detecting narcotics that smelled drugs (but found none) during one of the traffic stops in which Wheaton was involved, Poole's arrest in Kansas and the evidence found in her car and on her cell phone, and travel-related documents seized from Poole's home pursuant to a search warrant.

## C.     Jury deliberations and Wheaton's motion for a new trial

At trial, Wheaton declined to present any evidence, instead moving for acquittal at the close of the government's case pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  The district court overruled the motion and, prior to closing arguments, instructed the jury on the law. Before sending the jury out to deliberate, the court told the jury to send a message to the court if it wished to see any of the exhibits admitted into evidence.  The court further instructed the jury: "Remember that you must make your decision based only on the evidence that you saw and heard here in Court.  Do not try to gather any information about the case on your own while you are

deliberating. . . . [D]o not conduct any independent research, reading, or investigation about the case."

Approximately a day and a half after Wheaton's case was submitted to the jury for deliberation, the jury requested the "means" to replay the audio and video recordings of the encounter between Wheaton and Postal Inspector Rae. The district court and the attorneys agreed to play the CD and the VHS tape in the courtroom, without providing an opportunity for the jury to pause or replay them.

After playing the recordings, the district court was informed that one of the jurors had used a laptop computer in the jury room. An in-chambers inquiry of that juror was conducted by the judge with both attorneys present. The inquiry revealed that, before making the request to the court for means to replay the audio and video recordings, the juror had used his laptop to play the audio CD for the other jurors. The juror acknowledged that he had wireless internet access on his computer, but stated that there was no wireless internet available "in this building or anywhere nearby." Finally, the juror explained that he had used a program called "Microsoft Map Point" to answer a question that had come up during deliberations about the relative distance between Youngstown and two other towns in Ohio.

The district court privately admonished the juror for impermissibly using the laptop. It then brought the jury into the courtroom and reminded the jurors that they were not allowed to do independent research and that they had to keep their personal belongings underneath the table. The court further explained that if the discussions about the distance between the towns had "in any way impacted or affected or made its way into your decision-making process one way or the other. . . . or to any extent, even minimally, swayed you either way, we have to know about it." At that point, the court asked the jury whether the use of the juror's computer had in any way affected anyone's decisionmaking, and the jurors responded by shaking their heads negatively. The jury also confirmed that no other jurors had done any independent investigation. Reminding the jury to "[s]tick to what you have, the evidence in this case only," the court then instructed the jury to continue with its deliberations.

Later that day, the jury foreman sent the district court a note stating that the jury "appear[ed] to be deadlocked in regard to reaching a verdict." The court then brought the jury into the courtroom and asked whether taking a night to think about the case would "help the process at all, or . . . the possibility of moving towards an agreement, either way." Statements made by various jurors indicated that there was disagreement about whether the jury should continue discussions the following day. One juror stated: "I feel we are too adamant . . . that we have a lock." That juror also acknowledged, however, that "[w]e are still talking." The district court then instructed the jury to go home, "sleep on it, come back tomorrow morning at the same time, and we'll wait for another note from you as to whether you have made any progress or not."

After the jury was dismissed, Wheaton's attorney expressed concern to the district court that some jurors might give up on their position "simply because they don't want to be the cog in the wheel." In response, the court sent a note to the jury the following morning reminding them that "we do not want anyone to give up firmly held convictions simply to get along or to end the case. After examining the evidence and listening to your colleagues, apply the law and reach a decision honestly, and in good conscience." The jury reached a guilty verdict a little more than an hour later. In addition, the jury found, by special verdict, that the amount of cocaine involved in the conspiracy was more than five kilograms.

Wheaton subsequently filed a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. He alleged that the misconduct of the juror using the laptop computer had undermined the integrity of the jury's verdict. In particular, he argued that "[t]he fact that the juror

was not initially forthcoming about the true use of the personal computer and the fact that the jury was able to suddenly reach unanimity within a few minutes of resuming deliberations raises a cloud of suspicion over the integrity of the jury's deliberations." The district court denied the motion in an opinion and order, concluding that the interests of justice did not require a new trial.

## D.      Sentencing

Wheaton, after submitting objections to the Presentence Report (PSR), was sentenced in July of 2006. His objections to the PSR were based on two separate computations under the Guidelines. First, Wheaton challenged a two-level enhancement to his base offense level, under USSG § 2D1.1(b)(1), resulting from the firearm found at 926 Sherwood at the time of Wheaton's arrest. Wheaton contested the calculation on the basis that there was insufficient evidence linking him to the firearm. He also objected to the addition of two criminal history points, pursuant to USSG § 4A1.1(e), which resulted in his being assigned a criminal history category of III instead of II. The addition was based on the PSR's finding that the instant offense was committed less than two years after he was released from custody for a prior offense. According to Wheaton, however, the evidence presented by the government indicated that his involvement in the charged conspiracy began in January of 2001. He therefore contended that the computation based on § 4A1.1(e) was incorrect because the instant offense was committed more than two years after his release from custody on December 2, 1998.

At the sentencing hearing, Wheaton renewed his objections to the Guidelines calculations. The district court, however, approved both the enhancement of Wheaton's base offense level under USSG § 2D1.1(b)(1) and the addition of two criminal history points pursuant to USSG § 4A1.1(e). After discussing the sentencing factors listed in 18 U.S.C. § 3553(a), the court sentenced Wheaton to 235 months' imprisonment and three years of supervised release. This timely appeal followed.

## II. ANALYSIS

## A.      Motion for a new trial based on juror misconduct

Wheaton argues that he is entitled to a new trial due to the use of a laptop computer by one of the jurors during the jury's deliberations. He claims that by ignoring the district court's explicit instructions not to conduct any independent investigation, the juror's misconduct "undermined the integrity of the jury's verdict and violated [Wheaton's] rights to due process and a fair trial by an impartial jury." Moreover, Wheaton contends that a new trial is required because (1) the district court "failed to thoroughly investigate the claim of misconduct," (2) the juror with the laptop "was not initially forthcoming about the true use of the personal computer," and (3) the jury "miraculously" reached a verdict after having been deadlocked only a day earlier.

Rule 33 of the Federal Rules of Criminal Procedure permits a district court, upon a defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires." "The decision whether to grant a new trial is left to the sound discretion of the district court, and this Court will not reverse absent a clear abuse of discretion." *United States v. Pierce*, 62 F.3d 818, 823 (6th Cir. 1995). We apply the abuse-of-discretion standard in jury-misconduct cases precisely because "[t]he trial judge is in the best position to determine the nature of the alleged jury misconduct, and . . . . to determine appropriate remedies for any demonstrated misconduct." *United States v. Copeland*, 51 F.3d 611, 613 (6th Cir. 1995).

When an allegation of juror misconduct arises, a district court is required to investigate the claim in order to determine whether the misconduct tainted the trial. *United States v. Lloyd*, 462 F.3d 510, 518 (6th Cir. 2006). In the present case, the district court promptly undertook an investigation of the juror's alleged misconduct. The court immediately called counsel into chambers for detailed questioning of the juror in question. It also addressed the entire jury in open court.

During the latter portion of the inquiry, the court specifically asked the other jurors whether the use of the laptop had impacted their decisionmaking, and the jurors responded that it had not.

The district court took further steps to remedy the juror's misconduct by admonishing the jury for its outside investigation of travel distances and giving a curative instruction to remind them that the verdict must be based solely on the evidence presented at trial. *See Copeland*, 51 F.3d at 613-14 (concluding that the district court did not abuse its discretion in dealing with allegations of juror misconduct where it "investigated the merits of the charge and rendered the appropriate cautionary instructions"). Notably, Wheaton's attorney did not object in any way to the district court's treatment of the juror misconduct, which suggests that the misconduct was not perceived to be a serious concern at the time. Wheaton's current argument that the district court failed to thoroughly investigate the claim is thus unpersuasive.

Furthermore, Wheaton's claim that he was entitled to a new trial must fail because he has not demonstrated that any prejudice resulted from the misconduct. *See United States v. Sherrill*, 388 F.3d 535, 537 (6th Cir. 2004) (denying a Sixth Amendment claim based on juror misconduct where the defendant "provided no evidence . . . that [the alleged misconduct] had a prejudicial effect on his defense"); *see also Smith v. Phillips*, 455 U.S. 209, 217 (1982) ("[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation."). Wheaton did not explain to the district court, and has not explained to us, how the extrinsic evidence viewed by the jury—a map showing the relative distance between Youngstown and two other Ohio towns—was in any way related to the elements of the conspiracy for which Wheaton was charged. We agree with the government that "there is no reasonable likelihood that the mere knowledge of the location of the [two towns] could have tainted the jury's deliberations, given the issues framed by the charge, the government's proofs, and Wheaton's defense." *Cf. United States v. Solorzano-Salazar*, No. 88-1490, 1990 WL 74770, at *2 (9th Cir. June 5, 1990) (unpublished) (concluding that a district court did not abuse its discretion in denying the defendant's motion for a new trial where a juror impermissibly drew a scaled map, but the map in question did not relate to anything "critical to the government's case").

Wheaton also attempts to show prejudice by asserting that the jurors might have used the laptop to access his criminal record on the internet, which would have allowed the jury to "draw impermissible inferences about his criminal history." This claim, however, is based on pure speculation. To the contrary, the juror with the laptop told the district court that there was no internet access available in the building, and the other jurors corroborated this statement by assuring the court that they had not used the laptop for any other purpose than relistening to the CD already admitted into evidence and looking at the mapping software. The district court acted within its discretion in determining that the jurors' statements were credible. *See United States v. Pennell*, 737 F.2d 521, 533 (6th Cir. 1984) ("[I]f a district court views juror assurances of continued impartiality to be credible, the court may rely upon such assurances . . . ."); *see also Smith*, 455 U.S. at 217 n.7 (rejecting the notion that testimony by a juror in an investigatory hearing is "inherently suspect").

Finally, Wheaton attempts to raise an inference of prejudice by claiming that "the fact that the jury was able to suddenly reach unanimity within a few minutes of resuming deliberations raised serious suspicion over the integrity of the jury deliberations." But as the district court aptly noted, Wheaton's attempt to show that "the timing of the verdict supports an inference of prejudice does not hold weight." Wheaton's counsel conceded that it is not uncommon for a jury to indicate that it cannot reach a decision one day and then return the following day and quickly reach a unanimous verdict.

In any event, Wheaton must do more than raise a "serious suspicion" in order to demonstrate that he is entitled to a new trial. He bears the burden of *proving* that the jury was biased. *See United States v. Rugeiro*, 20 F.3d 1387, 1390 (6th Cir. 1994) (concluding that juror misconduct does not

create a presumption of prejudice and that the defendant bears the burden of proving actual bias). Wheaton has not shown any logical link between the juror's use of the laptop, the subsequent report that the jury was deadlocked, and the guilty verdict that they reached the following day. For these reasons, we conclude that the district court did not abuse its discretion by failing to grant Wheaton's motion for a new trial on the basis of juror misconduct.

**B.      Jury instructions**

Wheaton next contends that the district court erred by failing to properly instruct the jury with respect to the testimony given by Lynn and Poole. Specifically, he argues that the court should have included a jury instruction that highlighted the fact that Lynn was given "a couple hundred dollars" by the government to pay for "operational expenses." Wheaton also claims that the district court erred by failing to include an instruction based on the fact that Lynn and Poole were unindicted coconspirators.

Both parties agree that because Wheaton failed to object to the jury instructions at trial, his argument should be evaluated under the plain-error standard of review. *See United States v. DeJohn*, 368 F.3d 533, 540 (6th Cir. 2004). To demonstrate plain error, Wheaton must show (1) there was an error, (2) the error was "obvious or clear," (3) the error affected his substantial rights, and (4) the error "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006) (internal quotation marks omitted).

In instructing the jury about the weight to give witness testimony, the district court stated: "You have . . . heard the testimony of several witnesses. You have heard that the government has promised them either reduced sentences *or other consideration* for their testimony. . . . [Y]ou should consider their testimony with more caution than the testimony of other witnesses." (Emphasis added.) The court went on to explain that the jury should "[c]onsider whether their testimony . . . may have been influenced by the government's promises. Do not convict the defendant based on the unsupported testimony of such a witness standing alone, unless you believe his or her testimony beyond a reasonable doubt."

We are unpersuaded by Wheaton's challenge to these instructions for two reasons. First, the jury received ample notice that it should view both Lynn's and Poole's testimony with suspicion. Second, the instructions given by the court were almost identical to the model instructions included in Sixth Circuit Pattern Criminal Jury Instruction 7.06A, which addresses the testimony of a paid informant.

Wheaton correctly points out that the district court did not explicitly mention the "operational expenses" provided to Lynn by the government or the fact that neither Lynn nor Poole were being prosecuted in the charged conspiracy. But the court did clearly instruct the jury that it was to view their testimony "with more caution than the testimony of other witnesses." Indeed, the court explained that the government promised certain witnesses "reduced sentences or other consideration for their testimony," which presumably includes the "couple hundred dollars" that Lynn referred to during his testimony. Such warnings are sufficient to ensure that Wheaton's substantial rights were not adversely affected. *Cf. United States v. Vinson*, 606 F.2d 149, 154 (6th Cir. 1979) (concluding that the district court was not required to give an informant instruction because the witness's testimony was materially corroborated by other witnesses and the court had given an accomplice instruction, which "had the same cautionary effect as if the judge had given the instruction the [defendant] requested"); *United States v. Narviz-Guerra*, 148 F.3d 530, 538 (5th Cir. 1998) (concluding that the district court committed no error by not specifically including a compensated-witness instruction where it had already instructed the jury to view that witness's testimony with caution because of a plea agreement).

Wheaton further argues that the district court did not specifically instruct the jury that Lynn and Poole were accomplices to the charged conspiracy. The usage notes for Sixth Circuit Pattern Criminal Jury Instruction 7.08, however, explicitly state that an accomplice instruction "is not necessary if the jury has been instructed to treat the witness's testimony with caution for other reasons." Because, as discussed above, the district court gave the required cautionary instruction, it did not err by failing to include an accomplice instruction. We therefore hold that the district court did not commit plain error in instructing the jury with regard to the appropriate weight to be given to Lynn's and Poole's testimony.

## C.     Evidentiary objections

Wheaton also makes a series of challenges to the evidence presented by the government at his trial. Relevant to each of these arguments are the elements of the drug conspiracy with which Wheaton was charged and the government's burden of proof on these elements. "The elements of a drug conspiracy are (1) an agreement by two or more persons to violate the drug laws, (2) knowledge and intent to join in the conspiracy, and (3) participation in the conspiracy." *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). A conspiracy can be proven without the existence of a formal agreement. *Id.* Indeed, the existence of a conspiracy "may be inferred from circumstantial evidence that can reasonably be interpreted as participation in a common plan." *Id.* at 608-09. The government, moreover, "need not show that a defendant participated in all aspects of the conspiracy; it need only prove that the defendant was a party to the general conspiratorial agreement." *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997).

### 1.     *Admissibility of the photograph of the gun found at 926 Sherwood*

Wheaton claims that the district court erred by admitting the photograph of the gun found at 926 Sherwood. He argues that the photograph was irrelevant because he was never seen possessing any weapon, and the gun's existence did not make his membership in the conspiracy more or less likely. Alternatively, he contends that the photograph should have been excluded because of its prejudicial nature.

We review a district court's evidentiary determinations under the abuse-of-discretion standard, mindful that "it is an abuse of discretion to make errors of law or clear errors of factual determination." *United States v. McDaniel*, 398 F.3d 540, 544 (6th Cir. 2005); *see also United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002) (reviewing the admission of guns recovered from the defendants' residence under the abuse-of-discretion standard). The evidence must be viewed "in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Cope*, 312 F.3d at 775 (internal quotation marks omitted). Moreover, "an erroneous admission of evidence that does not affect the 'substantial rights' of a party is considered harmless, and should be disregarded." *Id.*

Under Rule 401 of the Federal Rules of Evidence, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." This court has made clear that firearms, as tools of the drug-trafficking trade, are probative evidence in drug prosecutions. *See, e.g.*, *United States v. Randolph*, No. 97-5990, 173 F.3d 857, 1999 WL 98564, at *4 (6th Cir. Jan. 27, 1999) (unpublished) ("Evidence of weapons, including firearms, is relevant to proving intent or a conspiracy to distribute drugs."); *United States v. Marino*, 658 F.2d 1120, 1123 (6th Cir. 1981) (concluding that guns found in the defendant's suitcase at the time of his arrest were admissible because they were "relevant to prove [the defendant]'s intent to engage in a conspiracy to import cocaine").

Although Wheaton correctly notes that there was no testimony linking him directly to the gun at 926 Sherwood, there was ample evidence linking him to the location. Multiple witnesses

testified that they had seen him at 926 Sherwood and that he repeatedly parked his car in front of that residence. Detective Coleman testified that Wheaton had parked there a few moments before he was arrested. There was also substantial evidence linking 926 Sherwood to the other residences on Sherwood, all of which were owned by Wheaton's codefendant Anderson and contained drugs, firearms, and other drug paraphernalia on the day of Wheaton's arrest.

Viewing all of this evidence in the light most favorable to the government, the district court did not abuse its discretion in concluding that the gun was relevant to the charge against Wheaton, and therefore admissible under Rule 402 of the Federal Rules of Evidence. *See Marino*, 658 F.2d at 1123; *see also United States v. Martinez*, 808 F.2d 1050, 1056-57 (5th Cir. 1987) (concluding that the district court did not abuse its discretion by admitting a gun found in the backseat of a car in which defendant was a passenger because "the inference of an illegal enterprise that arises from the pistol's presence supports the [drug] conspiracy theory on which Martinez was tried").

Wheaton also argues that the prejudicial nature of the photograph outweighed its probative value. *See* Fed. R. Evid. 403. This argument, however, is considerably weakened by the fact that the district court gave two limiting instructions related to the gun—one when the testimony about the firearm was first admitted and another when the court instructed the jury on the law. Those instructions explicitly stated that the handgun was found "where Wheaton was alleged to have frequented or been at certain moments in time," and cautioned the jury that the gun could not be used as proof of Wheaton's character. Thus "any possible prejudice that might have resulted from [the photograph's] admission was cured by the limiting instruction[s] given" by the district court. *See Marino*, 658 F.2d at 1123. For these reasons, we conclude that the district court did not abuse its discretion in admitting, with a cautionary instruction, the photograph of the gun.

### 2.  *Sufficiency of the evidence*

Wheaton makes a number of other arguments challenging the evidence presented by the government. Although he frames each claim slightly differently, they all challenge the sufficiency of the evidence to support his conviction. We therefore review Wheaton's claims to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *United States v. Wood*, 364 F.3d 704, 716 (6th Cir. 1989) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A review for sufficiency of the evidence requires us to "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006) (internal quotation marks omitted). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999) (internal quotation marks omitted).

Wheaton first attempts to attack the sufficiency of the evidence on the basis that Lynn's and Poole's testimony were "[a]t the core of the proof relied on for the conviction." According to Wheaton, the testimony of these witnesses was inherently unreliable and therefore cannot form the basis for a guilty verdict. To the extent that Wheaton asserts that Lynn's and Poole's testimony was deficient because it was unsupported by other evidence, he ignores substantial evidence presented at trial corroborating their testimony. His attack on their status as unindicted coconspirators, moreover, cannot succeed because "[a]ttacks on witness credibility are simple challenges to the quality of the government's evidence and not the sufficiency of the evidence." *Paige*, 470 F.3d at 608 (internal quotation marks omitted).

Wheaton also alleges, albeit implicitly, that the evidence failed to show that he was "Kev," the California drug supplier. He relies, for example, on the fact that the government did not specifically link him to the pager number that Poole used to contact "Kev." The government,

however, presented the direct testimony of two admitted coconspirators who identified Wheaton as "Kev" and linked him specifically to Youngstown and to the residences on Sherwood. In addition, compelling circumstantial evidence, including testimony that Wheaton had repeatedly shown law enforcement officers a California driver's license and had identified himself to Postal Inspector Rae as Kevin Smith, corroborated the direct testimony provided by Lynn and Poole. Thus, to the extent that Wheaton challenges the government's proof on the basis that there was no link between him and the person known as "Kev," his argument lacks merit.

Finally, Wheaton contends that the government did not demonstrate that he was a part of the conspiracy, noting that "when he was arrested, there were no drugs or large sums of money in his possession." This claim, however, misapprehends the elements of the crime with which he was charged. Indeed, Wheaton seems to be arguing that his conviction is unsupportable simply because the government did not provide direct, irrefutable evidence that he himself was selling cocaine. But the government had to show only that two or more people agreed to violate the federal narcotics laws, and that Wheaton knowingly joined that conspiracy. The government put forth testimony from 14 witnesses who provided both direct and circumstantial evidence linking Wheaton to a conspiracy to distribute cocaine and possessing the drug with the intent to distribute.

In short, there is ample evidence from which a reasonable juror could conclude that a conspiracy to distribute cocaine existed and that Wheaton "knew of, intended to join, and participated in that conspiracy." *See Paige*, 470 F.3d at 609. We therefore conclude that there was sufficient evidence to support Wheaton's conviction.

## D.     Objections to the sentence

Wheaton next contests his sentence of 235 months of imprisonment. He raises six grounds, all of which, in one way or another, present challenges to the reasonableness of the sentence imposed. In particular, he claims that the district court erred by (1) increasing his base offense level because of his constructive possession of a firearm, (2) increasing his criminal history category after finding that he committed the instant offense less than two years after being released from custody for a prior offense, (3) denying his request for a downward departure, (4) denying his request for a variance, (5) failing to adequately explain the sentence it imposed, and (6) imposing a sentence "greater than necessary" to fulfill the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

### 1.     *Claims relating to procedural reasonableness*

We review a district court's sentencing determination for reasonableness, which has both a procedural and a substantive component. *Gall v. United States*, 128 S. Ct. 586, 597 (2007); *United States v. Thomas*, 498 F.3d 336, 339 (6th Cir. 2007). Thus, when reviewing a district court's sentencing determination, we must "first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, . . . failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall*, 128 S. Ct. at 597.

### a.     *Two-level enhancement of Wheaton's base level offense pursuant to USSG § 2D1.1(b)(1)*

At the sentencing hearing, the district court increased Wheaton's base offense level pursuant to USSG § 2D1.1(b)(1), which provides for a two-level increase "[i]f a dangerous weapon (including a firearm) was possessed" during the commission of a drug offense. Wheaton claims that this calculation was in error, making his sentence procedurally unreasonable.

A district court's determination that the defendant possessed a firearm during a drug offense is a factual finding that this court reviews under the clearly erroneous standard. *United States v.*

*Darwich*, 337 F.3d 645, 664 (6th Cir. 2003). A finding of fact is clearly erroneous "when, although there may be some evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985).

Before a district court can apply a sentencing enhancement under USSG § 2D1.1(b)(1), the government must show "by a preponderance of the evidence that the defendant either actually or constructively possessed the weapon." *Darwich*, 337 F.3d at 665 (internal quotation marks omitted). "Constructive possession of an item is the ownership, or dominion or control over the item itself, or *dominion over the premises where the item is located*." *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996) (citation and internal quotation marks omitted) (emphasis added). If the government establishes that the defendant possessed a weapon, a presumption arises that "the weapon was connected to the offense. The defendant must then show that it was clearly improbable that the weapon was connected with the crime." *United States v. Hough*, 276 F.3d 884, 894 (6th Cir. 2002) (internal quotation marks omitted).

The evidence in the record supports the finding that Wheaton had constructive possession of the gun at 926 Sherwood. Both McDowell and another witness testified that the house had been used to conduct drug transactions. McDowell recalled that, on one occasion, he observed two kilograms of cocaine at 926 Sherwood when Wheaton was present, and the latter making a joke about cutting out Anderson as a middle man. Witnesses also saw Wheaton parking in front of the residence on numerous occasions. In addition, Wheaton himself stated that he had lived at 926 Sherwood, an admission that reinforces the conclusion that he had "dominion over" the house where the gun was found. *See Hill*, 79 F.3d at 1485.

That other people, including Anderson, may also have had access to or control over 926 Sherwood is of no moment because, as the district court properly noted, the law recognizes joint possession. *See United States v. Craven*, 478 F.2d 1329, 1334 (6th Cir. 1973), *abrogated on other grounds by Scarborough v. United States*, 431 U.S. 563 (1977) ("Possession [of a firearm] . . . need not be exclusive but may be joint."). A review of the evidence thus demonstrates that the district court's finding that Wheaton had constructive possession of the gun because he had stayed at the house "for an extended period of time" and had access to the handgun found under the couch cushion was not clearly erroneous.

The district court also had reason to conclude that the gun was related to the charged conspiracy. As the court noted, no drugs were found at 926 Sherwood, but there was substantial evidence that the three Sherwood residences were "tied together." The court also correctly pointed out that "[t]he drugs and the gun do not have to be in the same location" in order for the gun to be attributable to Wheaton, because the residence itself was associated with the drug conspiracy. *Cf. United States v. Bartholomew*, 310 F.3d 912, 924 (6th Cir. 2002) (concluding that the connection of a shotgun, which was found in a closet near a stairway leading to a basement where drugs were sold, to the drug offense was not clearly improbable).

Furthermore, Wheaton never provided the district court with a nondrug-related reason for why a loaded gun was under a couch cushion, which is a "place indicating purposeful concealment rather than a place indicating possession for a legal purpose." *See United States v. Chalkias*, 971 F.2d 1206, 1217 (6th Cir. 1992) (affirming a USSG § 2D1.1(b)(1) enhancement based on the defendant's constructive possession of a firearm found in the basement rafters of her apartment). The bare assertion of Wheaton's counsel that the gun might simply have been for the lawful purpose of defending the residence is insufficient to sustain Wheaton's burden of showing that it was "clearly improbable" that the gun was related to the drug conspiracy. *See Hough*, 276 F.3d at 894. For these

reasons, we conclude that the district court's decision to apply the two-level enhancement under § 2D1.1(b)(1) was not clearly erroneous.

### b. *Increase of Wheaton's criminal history category under USSG § 4A1.1(e)*

Wheaton next argues that the district court erred by increasing his criminal history category pursuant to USSG § 4A1.1(e), which adds two criminal history points where "the defendant committed the instant offense less than two years after release from" custody for a prior offense. As with determinations relating to enhancements under USSG § 2D1.1(b)(1), we review a district court's factual findings concerning a defendant's criminal history category, which must be based on a preponderance of the evidence, under the clearly erroneous standard of review. *See Hough*, 276 F.3d at 896.

The key issue here is whether there is evidence in the record to support the district court's finding that Wheaton entered the conspiracy before December 2, 2000, which was two years from the date that he was released from custody for his prior offense. Wheaton contests the court's finding on the basis that, as he set out in his objections to the PSR and at the sentencing hearing, there is no evidence, other than Poole's testimony, that he participated in the conspiracy before January of 2001.

In defense of the district court's ruling, the government argues that corroborating evidence is not required for USSG § 4A1.1(e) to apply. It contends that Poole's testimony alone was sufficient for "the district court [to] reasonably conclude[] that Wheaton joined the conspiracy less than two years after his December 2, 1998, release from imprisonment." The government, moreover, urges us to conclude that because the district court's finding was "one of 'two permissible views of the evidence,'" the court's choice between them "cannot be clearly erroneous." *See United States v. Darwich*, 337 F.3d 645, 664 (6th Cir. 2003).

At the sentencing hearing, the district court acknowledged that Wheaton's involvement in the conspiracy was not "corroborated . . . until probably January of 2001." Nevertheless, the court also said that, according to its "recollection," there had been testimony that Anderson and Love had approached Lynn about transporting cocaine from Los Angeles in November of 2000, and that "Wheaton's name came up as Kev, i.e., he had already been supplying Love and Anderson prior to that time." The court further reasoned that "[i]f the jury found that [Wheaton] was involved in the conspiracy they would have had to find that he was involved when the initial contacts were made, . . . and the jury found that he was." It therefore found that Wheaton had entered the conspiracy in late November of 2000, resulting in the additional two points pursuant to USSG § 4A1.1(e).

Contrary to the district court's recollection of the evidence, Lynn actually testified that Anderson and Love originally approached him about the California cocaine connection at the beginning of 2001. Wheaton therefore correctly points out that the only evidence in the record that supports the district court's finding is Poole's testimony about when she first made contact with "Kev." Indeed, the district court properly recalled that phone records, plane tickets, and other documents corroborating Poole's trips to California do not appear until January of 2001. The question thus remains whether Poole's testimony, standing alone, was sufficient to implicate Wheaton in the conspiracy prior to December 2, 2000.

We acknowledge that this presents an extremely close factual question, and that the evidence in the record linking Wheaton to the conspiracy before December of 2000 is thin. The government correctly points out, however, that Poole's testimony "places Wheaton's participation in the conspiracy as early as November 2000, but before December 13, 2000." Poole testified that she was released from jail on an unrelated matter just prior to Thanksgiving of 2000, and that she made the

trip to California during which she met Kev soon after her release. She further explained that she made a second roundtrip by car to pick up marijuana in San Diego before the third trip to California that culminated in her car accident on December 13, 2000. This testimony supports the logical conclusion that—based on the timeline that Poole provided and taking into account the time required to travel back and forth between Ohio and California by car—it was more likely than not that she first met Wheaton at least 12 days before she wrecked her car in Arkansas (i.e., before December 2, 2000).

Moreover, we note that Lynn's testimony that he thought he had not made the cocaine arrangement with Anderson and Love until early 2001 does not unequivocally refute Poole's more detailed recollections about her first and second meetings with Wheaton. And although the district court incorrectly recalled and described the evidence underlying its finding that Wheaton entered the conspiracy before December 2, 2000, the fact that there *is* evidence in the record to support that finding is sufficient to preclude us from second guessing the court's determination. *Cf. Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 445 (6th Cir.1999) (explaining that we may affirm the district court where the court reached the right result for the wrong reason).

In short, we are unable to say that we are "left with the definite and firm conviction that a mistake has been committed" in finding that Wheaton entered the conspiracy before December 2, 2000. *See Darwich*, 337 F.3d at 664. We therefore conclude that the district court properly increased Wheaton's criminal history category pursuant to USSG § 4A1.1(e).

### c.       *Wheaton's request for a downward departure*

Wheaton further attacks his sentence by arguing that the district court erred in not granting him a downward departure. This claim, however, suffers from two fatal flaws. First, as the government points out, Wheaton did not seek a downward departure from the district court. Wheaton has therefore waived this claim. *See United States v. Ware*, 282 F.3d 902, 907 (6th Cir. 2002) (concluding that a defendant had waived his claim for a downward departure by failing to seek one from the district court). Moreover, even if Wheaton *had* requested a downward departure from the district court, any denial of a downward departure would be unreviewable so long as the district court understood that it had the authority to depart. *See United States v. McBride*, 434 F.3d 470, 476 (6th Cir. 2006). The record clearly reflects that the court below was aware of such authority.

This court's precedents, of course, do not prevent Wheaton from challenging either the district court's failure to grant a request for a *non*-Guidelines variance or the overall reasonableness of his sentence based on the factors set forth in 18 U.S.C. § 3553(a). *See id.* Because Wheaton makes both of these arguments, a consideration of their merits is taken up below.

### d.       *Wheaton's request for a downward variance*

In the district court, Wheaton argued for a downward variance based solely on the assertion that there was little evidence linking him to the gun at 926 Sherwood. His brief on appeal, by contrast, is replete with reasons why he should have received a below-Guidelines variance. Indeed, Wheaton now makes a variety of arguments based on the § 3553(a) factors—relating to his family background, lack of a violent history, relative lack of culpability in the present offense, and the low likelihood of recidivism—to support a variance below the Guidelines range. To the extent that Wheaton failed to make any of these specific arguments to the district court, we would review them for plain error. *See* Fed. R. Crim. P. 51(b); *United States v. Bostic*, 371 F.3d 865, 872-73 (6th Cir. 2004). This analysis is unnecessary, however, because the district court's explanation of Wheaton's sentence belies his contention that the court failed to address his belated arguments.

### e.        *The district court's explanation of Wheaton's sentence*

Wheaton claims that the court did not provide a sufficient explanation for the sentence it imposed. But the Supreme Court in *Rita v. United States*, 127 S. Ct. 2456 (2007), explained that although a district judge must "set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority," the judge may exercise discretion in determining how much explanation is necessary in a given case.   *Id.* at 2468.   Thus "when a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation."  *Id.*

Wheaton claims that the district court failed to adequately explain the sentence, but he fails to provide any argument or explanation of what, precisely, the court failed to mention. As noted above, Wheaton's only argument before the district court was based on the alleged lack of evidence linking him to the gun found at 926 Sherwood.  A review of the record, however, establishes that the court's discussion of the § 3553(a) factors accounted for most if not all of the arguments Wheaton failed to make but now argues that the court should have considered.

The district court's analysis of the § 3553(a) factors focused primarily on Wheaton's personal history and characteristics and the need to protect the public.   *See* 18 U.S.C. § 3553(a)(1)&(2).   It discussed Wheaton's background and past involvement with violence, discussed his family history, and surmised that his lack of a substance-abuse problem likely "added to his effectiveness as a higher level dealer."   Moreover, the court explained that "the Court is convinced Mr. Wheaton is intelligent, and is careful, and he went about his drug business with foresight and caution. And in a sense, that makes him all the more dangerous to society." The court further stated that "the defendant helped dump a huge amount of cocaine in the Youngstown area, poisoning an already struggling community. Mr. Wheaton needs to be removed from society to protect the public and give him an opportunity to redirect his life after given time to reflect in prison." *See generally* 18 U.S.C. § 3553(a)(2).

In sum, the district court's explanation of the sentence it imposed demonstrated its awareness of the § 3553(a) factors and how those factors should apply in Wheaton's case. *See, e.g.*, *United States v. Ferguson*, 456 F.3d 660, 667 (6th Cir. 2006) (upholding a sentence as reasonable where "the record amply demonstrate[d] that the court evaluated all of [the statutory factors]" and "balanced the relevant considerations"); *see also Rita*, 127 S. Ct. at 2469 (noting that the requirements of procedural reasonableness are met where "the record makes clear that the sentencing judge considered the evidence and arguments").  We therefore conclude that the district court adequately explained its reasons for imposing Wheaton's sentence.

### 2.        *Substantive reasonableness*

Wheaton was sentenced to 235 months of imprisonment, which is the minimum sentence within the applicable Guidelines range.  Because, as discussed in Parts II.D.1.a.&b. above, the Guidelines range was properly calculated, his sentence is accorded a rebuttable presumption of reasonableness. *United States v. Heriot*, 496 F.3d 601, 608 (6th Cir. 2007).

Wheaton has neither rebutted this presumption of reasonableness nor demonstrated that the district court abused its discretion in sentencing him to 235 months' imprisonment. *See Gall v. United States*, 128 S. Ct. 586, 597 (2007) (explaining that an appellate court may apply a presumption of reasonableness to within-Guidelines sentences and should review the substantive reasonableness of any sentence under an abuse-of-discretion standard).  District courts are charged with imposing "a sentence sufficient, but not greater than necessary" to fulfill the purposes of sentencing.  18 U.S.C. § 3553(a)(2); *United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006).  The district court in this case weighed the § 3553(a) factors and imposed a sentence that it

believed was necessary to "protect the public" and to provide Wheaton with an opportunity to rehabilitate himself. We therefore conclude that Wheaton's sentence was substantively reasonable.

## E.    Cumulative-error claim

Wheaton's final claim on appeal is that even if none of the issues he has raised constitutes reversible error, the "cumulative effect" of those errors rendered his trial fundamentally unfair, thereby violating his right to the due process of law. A defendant is in fact free to "show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004). But cumulative-error analysis permits us to look only at actual errors, not non-errors. *See Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004) (acknowledging that "trial-level errors that would be considered harmless when viewed in isolation of each other might, when considered cumulatively, require reversal of a conviction," but explaining that "the accumulation of non-errors cannot collectively amount to a violation of due process" (internal quotation marks omitted)). As we have discussed in the preceding sections, Wheaton has not shown that the district court committed any errors either at trial or in sentencing. His cumulative-error claim must therefore fail.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.