**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0624n.06

**No. 09-2305**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Jun 15, 2012**

LEONARD GREEN, Clerk

ELIZABETH PAKENAS,

    Plaintiff-Appellant,

v.

STATE FARM INSURANCE COMPANY,

    Defendant-Appellee.

)
)
)
)
)  ON APPEAL FROM THE
)  UNITED STATES DISTRICT
)  COURT FOR THE EASTERN
)  DISTRICT OF MICHIGAN
)

---

Before:    BOGGS and GIBBONS, Circuit Judges; and RUSSELL, District Judge.[*]

    BOGGS, Circuit Judge.  Elizabeth Ann Pakenas, legal guardian of the insured, Patti Rogers, her sister, sued State Farm Insurance Company for unpaid attendant-care benefits.  Pakenas had billed State Farm for attendant care, provided 24 hours a day, 365 days per year, for four-and-a-half years.  The United States District Court for the Eastern District of Michigan entered a directed verdict in favor of State Farm.  The court also granted State Farm's post-trial motion for attorney's fees.  Pakenas appealed, arguing that the district court erred when it denied her motion for a mistrial, when it entered a directed verdict, when it denied her motion for a new trial, and when it awarded attorney's fees to State Farm.  After careful consideration of the issues, this panel affirms the district court's judgment and award of attorney's fees.

---

    [*]Hon. Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

I

*Factual History*

This case originated when Patti Rogers (Rogers), the sister of Elizabeth Ann Pakenas, was injured in an automobile accident in 1976. Rogers suffered a closed head injury in the accident. Shortly after the accident, Rogers developed a seizure disorder that Pakenas claims still continues today. Taking the facts in the light most favorable to Pakenas, after the accident, Rogers "suffered a drop in IQ" from "extremely high"—she had been valedictorian of her high-school class—to "normal"—estimated at 100—or, in some areas, "below normal." She was not able to go to college, she has never been able to drive again, and, for the most part, she has been unable to work. At the time of trial, she saw a neurologist who treated her for seizures and had been taking anti-seizure medication for 30 years.

Pakenas, who has been Rogers's legal guardian since 2002, after she was declared legally incompetent, has been a primary care-provider for Rogers since the accident. Rogers's other primary care-provider has been John Rogers, her husband. According to trial testimony, "[Pakenas] and John flip, take turns caring for [Rogers]." Pakenas claims that Rogers was allowed to be unsupervised after the accident, but that after Rogers "became confused" and "would be found, lost," she was no longer allowed to travel alone. The work Pakenas and Mr. Rogers do for Rogers was described as "orient[ing] . . . help[ing] . . . counsel[ing]." Pakenas "functions really as a case manager." Their care does not include feeding, bathing, toileting—Rogers is capable of doing these things herself. At the time of trial and "over the years," Rogers had a job, sort of a "make work" job, according to plaintiffs, at a pharmacy, "for simple jobs and she's closely supervised."

Since 1976, the year of Rogers's accident, State Farm has paid medical expenses relating to Rogers's treatment, including all pharmaceutical bills, doctor bills, and health insurance. However, Pakenas did not know that she and Mr. Rogers were eligible to receive attendant-care benefits until 2000 or 2001.[1] Until that time, she claims, she and Mr. Rogers cared for Rogers without reimbursement.

As a result of discovering that Pakenas and Mr. Rogers were eligible for attendant-care benefits, Rogers filed a suit against State Farm under the Michigan No-Fault Act,[2] seeking attendant-care benefits that had been unpaid for 28 years. The attendant care at issue was 24-hour-per-day care that Rogers claimed she required due to seizures, plus 12% statutory interest for payments overdue by 30 days. This claim was settled in 2004 for $5.8 million dollars.[3] The settlement agreement "in no way preclude[d]" the recovery of future attendant-care benefits.

---

[1]Attendant-care benefits are separate from medical bills, health insurance, or mileage going to and from medical visits. State Farm has undisputedly provided the latter three for Rogers; only attendant care is at issue in this case.

[2]The act states, in relevant part: "Under personal protection insurance an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the provisions of this chapter." MICH. COMP. L. § 500.3105(1). "[P]ersonal protection insurance benefits are payable for the following: . . . (a) Allowable expenses consisting of all *reasonable charges incurred for reasonably necessary* products, *services* and accommodations for an injured person's *care*, recovery, or rehabilitation." MICH. COMP. L. § 500.3107(1)(a) (emphasis added). A prescription is not necessary to secure benefits; an insured only needs to show medical supporting documentation as to need.

[3]State Farm stated in the instant case that only Rogers, not Pakenas or Mr. Rogers, was deposed in relation to the settlement, that "[n]obody went through the medicals," "[n]obody talked to the doctors." State Farm's position is that Rogers was never grievously injured in the accident, that she only "banged her knee up, had a cut on her cheek, had a bump on her forehead and that was it," and that Rogers does not and has never suffered from a seizure disorder.

After the settlement was reached, Pakenas—now the guardian of Rogers—and Mr. Rogers established Pattico, described by Pakenas during her deposition as "a health-assistance company set up to take care of [Rogers]."[4]   Pakenas, Mr. Rogers, and Pakenas's daughter were all employed by Pattico during this period.  Pakenas, though employed by Pattico, has not been otherwise employed since the 1990s.  Pakenas claimed that she was "on call" for Rogers, and that if she was not on call then she was with her.  She stated in deposition that she was in contact with Rogers "several times a day or [Rogers] was over at my house or she's with me running errands or I'm taking her on errands."  Further, Pakenas claimed that she deals with all of Rogers's legal issues.  She stated that she paid herself $3,000 every month in pre-tax income from Pattico.[5]   Pattico paid Mr. Rogers $5,000 every month in pre-tax income.  Pakenas stated that her daughter, Tracey Priska, sometimes provided attendant-care services for Rogers, but that Pakenas did not keep track of the times.  She further stated that her daughter was paid by Pattico a "general base salary for whatever is required of her."  This amount included health insurance for Priska and her husband.

Between 2004, when the settlement was reached, and 2005, when the instant suit was filed, Pakenas claims that Rogers required 24/7 care.[6]   During the period of July 1, 2004 until March 13,

---

[4]Mr. Rogers and Pakenas are the president and vice-president of Pattico.

[5]Payments out of Pattico were derived from the $5.8 million settlement.  They were not paid from the attendant-care benefits billed to State Farm after the settlement because State Farm never paid any of these bills.

[6]Samples of the invoices Pakenas submitted are provided in Appellee's Appendix.  These invoices charged State Farm for attendant care, mileage, Rogers's health insurance, room and board, and miscellaneous doctor bills.  An "attendant care" sample portion of an invoice reads as follows:

2009, Pakenas submitted invoices to State Farm for attendant-care expenses. The invoices claimed that 24-hour-per-day care[7] had been provided at a rate of $22/hour,[8] which Pakenas claimed represented the "constant coverage and supervision of Mrs. Rogers by Mrs. Pakenas and Mr. Rogers and sometimes, other family members." The care claimed included not only physical care of Rogers, but also administrative services such as arranging for medical care or paying bills.

State Farm stopped paying the invoices Pakenas submitted, and Pakenas filed suit. She specifically sought to recover around the clock care, 24/7, for 53 months. She also sought the statutory interest of 12% for payments that are 30 days overdue.

*Procedural History*

---

Attendant Care for Patti Rogers

| | | |
|---|---|---|
| October 2004 | 31 days @ $528 (24 hours X $22/hr) | $16,368.00 |
| November 2004 | 30 days @ $528 | $15,840.00 |
| December 2004 | 31 days @ $528 (24 hours X $22/hr) | $16,368.00 |

Provided services: supervision, transportation, housework, handling personal matters, companionship and miscellaneous.

This invoice included a separate page on which doctor's appointments were listed. For example, for March 2005, there are six doctor's appointments listed: one on the 2nd, one on the 3rd, one on the 18th, one on the 21st, one on the 24th, and one on the 29th. No other "attendant care" activities are broken out on these sheets. Further, the doctor's appointments state what time the appointment started, but do not say when the appointment ended or if anyone accompanied Rogers to the appointment.

[7]Pakenas did not bill herself and Mr. Rogers separately—she claims that the two of them together amount to one 24-hour-a-day caretaker.

[8]Pakenas set this rate based on research into the prices of home care for Rogers. She got an average rate of "$14 to $30 an hour."

Elizabeth Pakenas filed a one-count suit in diversity in the district court against State Farm on June 29, 2005. She claimed that State Farm breached its contract with Rogers when it failed to pay attendant-care benefits. State Farm responded by admitting that the policy described in the complaint existed and that it fell under the Michigan No-Fault Act, but refused to admit that there were any outstanding unpaid benefits for or on behalf of Rogers.

A number of pretrial motions were filed, as State Farm struggled to compel discovery from the pharmacy where Rogers had worked, had to compel Pakenas to produce her and Mr. Rogers's cell-phone records (necessary because Pakenas had said that they were "on call" by phone for much of the 24/7 supervision), their tax returns, deposition testimony from Pakenas and Mr. Rogers, and an independent medical exam of Patti Rogers.

On July 2, 2008, Thomas Biscup and Paul Zebrowski, Pakenas's attorneys, moved to withdraw, citing a "breakdown in the attorney/client relationship." In an order dated August 22, the motion was granted, and Anthony Malizia was substituted as plaintiff's counsel.

A seven-day jury trial began on March 3, 2009. Pakenas specifically sought to recover for "around the clock care, 24/7, for 53 months;" however, she also stated that she was willing to accept "whatever this jury decides is an appropriate amount of money . . . for [the] attendant care claim . . . ."

At trial, the two sides presented dramatically different versions of the facts. According to Pakenas, Rogers is unable to work, has a seizure disorder, is easily lost or confused, requires more or less constant care, and has been severely debilitated by the accident. According to State Farm, Rogers was only mildly injured by the accident; she has held a steady job in a pharmacy since two

years after the accident, which the owner of the pharmacy attempted to hide; her doctor ignores facts in continuing to prescribe treatment as though Rogers has a seizure disorder, which she does not have; and Rogers basically lives unsupervised while Pakenas and Mr. Rogers bill State Farm for care she does not actually receive.

Pakenas admitted at trial that between 1976 and 2004 she had not provided Rogers with 24/7 care. She stated that she cared for Rogers, but also took care of her own family and her father. She testified that in the 1990s Rogers began to make "sudden changes" that led to an increase in her care, but admitted that there had still been "very short periods of time" when Rogers had been left alone.

On cross-examination, State Farm elicited testimony from Pakenas that Rogers did not have "actual physical seizures," but that "various medical providers . . . have said that [Rogers] is not having real seizures [but] she may be having pseudo seizures." These seizures were deemed "psychosomatic" or "psychogenic." Pakenas admitted that Rogers sometimes went to doctor's appointments by herself, and that "there would be some days where . . . she was by herself, but for the majority, and this is a big majority, either John, myself or she's been at the pharmacy, one of the kids, you know, whatever, somebody has managed to be with Patti." Pakenas equivocated on the number of hours a day that care was provided to Patti, testifying that it might have been "23 and a half [hours]. It might be 20. It might be 21 . . . ."

Mr. Rogers's testimony at trial portrayed Rogers as distracted and foolish, a potential danger to herself. He testified that her condition had deteriorated over the years. However, he admitted on cross-examination that he had not begun providing 24-hour-a-day care to Rogers until after his first deposition in 2006, stating as follows:

Q: Okay. And we had your deposition testimony, which said, yeah, we never provided her 24 hour care and I'd leave her alone?

A: Yes.

Q: You remember that?

A: Yes.

\*\*\*

Q: Would it help you to look at our deposition testimony?

A: It may or may not. You have to remember I'm trying to remember 33 years and pull it all together.

Q: No sir. This isn't 33 years ago. This was your testimony to me in 2006 that you left her alone all day, and that's the first time you realized it was dangerous to do so because she climbed up on a ladder and she fell down, remember that?

A: Yes, I did. Yes, I remember that.

Q: Do you remember testifying that even after that you would leave her for four hours at a time?

A: There were times when I had to, yes.

Q: Sure. You had to so you could go work out at the gym, remember?

A: (Witness nods head)

Q: Is that a yes?

A: Yes, absolutely.

\*\*\*

Q: Well, it's 24/7. Whoever wrote it down, that's when it's for, 24/7, and you acknowledge there's times when she's by herself?

A: She was by herself.

When he was shown an invoice billed to State Farm, he stated that he had not known that State Farm was being billed for 24-hour-a-day care. He said he had never stated that Rogers was getting 24-hour-a-day care, but rather "the best I was capable of giving her." He testified that during times when State Farm was billed for 24-hour-a-day care he would go to the gym or for walks without her, for up to four hours at a time. He stated that he had worked until 2004 outside the home, so that the $5.8 million in settlement money from State Farm had not actually paid for services provided, but for services that *would have been* provided had he been able to pay someone.

State Farm argued that because he admitted that he had not provided 24-hour-a-day care, while simultaneously not providing any record of what care was actually provided, that there was no way for a jury to determine what care should be billed to State Farm.

Paula Couch, the State Farm claim representative responsible for Rogers's case, testified that being "on call" was not compensable attendant care. She testified that she had never received documentation that Rogers required attendant care due to pseudo seizures, but that she had received documents stating that Rogers required supervision due to seizures.

After Ms. Couch's testimony, Judge O'Meara sent the jury out for a 15-minute break. He then made a statement to the attorneys in open court, stating that he believed "there [was] emerging evidence that the Plaintiffs have engaged in fraud." He further stated that "it's not impossible that somebody could characterize this testimony and this evidence as supporting an accusation of fraudulent activity on the part of the Plaintiff or Plaintiffs." He made clear that his statement "was just my observations" and that he was "certainly not going to say anything to the jury, and it isn't

going to prejudice the jury." The plaintiff's attorney tried to discuss these statements with the judge, but the judge told him that he did not wish to discuss it further.

The next court day after Judge O'Meara's statement, Pakenas moved for a mistrial. She argued that Judge O'Meara had made gratuitous prejudicial statements during trial and in open court stating that he thought the plaintiff might be guilty of fraud. Pakenas alleged that, in addition to plaintiff and defense counsel, their clients, and courtroom personnel, the wife of a juror was present during these remarks. Pakenas argued that it was a "virtual certainty" that the wife relayed these comments to her husband, a juror. Pakenas argued that the juror, Mr. Harvey, must be removed from the jury, but that a mistrial should also be granted since no curative instruction could remedy the possibility of "inadvertent jury tampering." Judge O'Meara orally denied the motion without prejudice during trial. He also dismissed Mr. Harvey. The judge stated that he thought plaintiff's objections might have merit, but could be "dealt with with a curative instruction." Trial resumed.

Dr. Verma, Rogers's current treating physician, who had been her physician since 2003, testified by video deposition. He stated that though he had never witnessed any seizures from Rogers that Rogers's EEGs from 1997 were abnormal and indicated "underlying convulsive tendency." He testified that Rogers did not need daily caregiving with regard to feeding herself, but that she did require caregiving for "general observation of her needs, and her driving . . . . For seeing if she's having any seizures or any alteration of her medical condition."

Pakenas's last witness, Dr. Guidice, also testified by videotaped deposition. Guidice's deposition stated that she had been caring for Rogers since 1981. She testified that she had not treated Rogers since Guidice's last visit in Michigan, in 2001 or 2002—when Guidice left Michigan,

she referred Rogers to Dr. Verma. She testified that Rogers began to experience seizures about one year after her accident, and that these were related to traumatic brain injury from the accident. She testified that she had observed seizure activity on EEGs of Rogers, and that 55 of 57 of Rogers's EEGs were abnormal. She testified that Rogers might be able to work in a part-time, supported position, but that she required supervision because she did "dumb stuff," "doesn't have good judgment," "gets herself in trouble," by, for example, "locking herself out when it's cold," and requires supervision to prevent her from doing these things. She replied affirmatively that "somebody should be with [Rogers] all the time."

After Dr. Guidice's deposition was played, Pakenas rested.

On Tuesday, March 10, 2009, State Farm made an oral Rule 50 motion for a directed verdict. State Farm stated, in relevant part, that Mr. Rogers's testimony had shown that Rogers had not received the attendant care Pakenas had claimed. State Farm claimed that "to establish the need for attendant care 30 years subsequent to the accident, [plaintiff] would have to show a deterioration in [Rogers's] condition that was in fact connected to her automobile accident." The only such evidence plaintiff had shown, State Farm claimed, was the testimony of Dr. Guidice, who had testified that she was not sure whether any deterioration in Rogers's condition had been caused by the accident or by "medication toxicity."

On Friday, March 13, Judge O'Meara orally granted State Farm's Rule 50 motion for a directed verdict. Neither Pakenas nor her attorney were present in court on that day—Mr. Malizia, according to the district judge, "apparently was very ill last night and went to the hospital, and while he's back home, [he] can't be here today." The judge stated:

> [Plaintiff's absence] puts to the Court a question what I should do. There are a couple of things at least that I should do that I'm not going to do. One is to declare a mistrial . . . . The other thing is I could say well, maybe [plaintiff's attorney will] be all right on Monday or maybe Tuesday . . . and we'll get you back in here and we'll go on with the trial. And I'm not going to do that either, for a number of reasons. The principal of which . . . is that there is . . . a Rule 50 motion . . . .
>
> . . .
>
> I will enter judgment as a matter of law for Defendant . . . and do that on the basis that—there are two or three ways that I could do this but I'm not going to spend a whole lot of time explaining all of them.
>
> The principal basis upon which I think Plaintiff did not make out their case . . . is that they did not prove—offer any proof as far as the Court believes . . . that there were expenses incurred in attendant care of Mrs. Rogers.
>
> . . . . I was prepared, if the jury came back with an award for the Plaintiff, I was pretty much resolved . . . that if you'd awarded something, that I would have set it aside as a matter of law . . . .
>
> In any event, I'm doing that now preliminarily. And I'm doing it for one further reason . . . . It's not one that led to my conclusion.
>
> And that is that you have been patient, you've been a very, very good jury. And my conclusion is that you have been patient in a case that has not been tried efficiently on either side, and it's taken a whole lot longer than . . . it should have taken, and I'm not going to keep you here any longer.

*Id.* at 6–9.

On March 17, 2009, the district judge issued an order granting State Farm's Rule 50 motion. The judge held that "no reasonable jury could find that Plaintiff set forth evidence of attendant care expenses incurred as a result of Plaintiff's 1976 automobile accident."

On April 13, 2009, Pakenas moved for a new trial. She argued that Judge O'Meara's grant of State Farm's Rule 50 motion was premature because State Farm had not based its motion on whether or not Pakenas had "incurred" attendant care expenses. She argued that, had plaintiff's counsel been in court, he would have successfully objected to the motion on this basis. She further argued that she had made out a prima facie case sufficient to defeat a directed verdict, including

evidence that expenses had been incurred. She also argued that Judge O'Meara was biased against Pakenas and that he should have recused himself, and that only a new trial would rectify the harm done.

The district court denied the motion. The court determined that plaintiff's admissions at trial demonstrated that 24-hour care was not needed for Rogers, but that Pakenas had only submitted claims for 24-hour attendant care to State Farm. "Given the evidence," the court reasoned, "the jury had no reasonable basis to award 24-hour-per-day care and no reasonable basis to estimate how much care, if any, was actually provided." The court stated that the decision to grant the Rule 50 motion was the result of its view of the merits and not personal bias. The court also stated that "[p]laintiff's counsel did not provide the court sufficient notice of his illness to enable the court to reschedule court proceedings and notify the jury."

On April 14, 2009, State Farm moved for attorney's fees pursuant to Michigan Compiled Laws (M.C.L.) § 500.3148(2), which states, "An insurer may be allowed by a court an award of a reasonable sum against a claimant as an attorney's fee for the insurer in defense against a claim that was in some sense fraudulent or so excessive as to have no reasonable foundation . . . ." State Farm emphasized in its motion that it was predicating its claim on Pakenas's claim having been "so excessive as to have no reasonable foundation." State Farm claimed it had incurred attorney's fees of $212,380 and paralegal fees of $13,387.50, as well as costs of $21,758.73 and requested that these be awarded also.

Pakenas responded, denying that her claims were unreasonably excessive or fraudulent. She also complained that paralegal fees are not separately recoverable under Michigan law, and that the $21,758.73 in costs that State Farm claimed were inappropriate.

On September 10, 2009, the district court issued an order granting State Farm's motion in part and denying it in part. The court noted that, though there were no published cases applying M.C.L. § 500.3148(2), the "Michigan Court of Appeals has upheld attorney's fee awards to defendant insurers in unpublished decisions." (citing *Robinson v. Allstate Ins. Co.*, 2004 WL 1057811 (Mich. App. May 11, 2004) and *Stoops v. Farm Bureau Ins. Co.*, 2006 WL 751404 (Mich. App. Mar. 23, 2006)). The court agreed with Pakenas that Michigan law did not provide for the recovery of paralegal fees and that State Farm's costs were not all taxable to Pakenas, and that it was too difficult for the court to determine which costs were taxable to her and which were not. Thus, the court granted State Farm's motion for $212,380 only.

This timely appeal followed.

II

Pakenas makes six arguments on appeal. Three of these deal with the motion for directed verdict, and the others contest the outcome of the motion for a new trial, the motion for a mistrial, and the grant of attorney's fees. Pakenas argues that the district court erred in three ways when it granted State Farm's motion for a directed verdict: first, exhibits had not yet been admitted into evidence and thus Pakenas had not been fully heard; second, Pakenas had established a prima facie case for attendant-care benefits and thus the case should have gone to the jury; and third, State Farm

was not entitled to a directed verdict because its motion did not comply with Federal Rule of Civil Procedure 50, it was granted on grounds that State Farm never raised, and plaintiff's attorney was absent from court when the directed verdict was granted. Pakenas's fourth argument is that the district court erred when it denied her motion for a new trial, and her fifth is that the court abused its discretion in denying her earlier motion for a mistrial. Finally, Pakenas argues that the court abused its discretion when it awarded attorney's fees for State Farm.

*Directed Verdict*

We review the trial court's decision to grant a motion for a directed verdict/judgment as a matter of law de novo. *Snyder v. Ag Trucking, Inc.*, 57 F.3d 484, 490 (6th Cir. 1995). However, under Michigan law, which governs this diversity case, the trial court's decision cannot be disturbed unless there has been a clear abuse of discretion. *Ibid.* (citing *Howard v. Canteen Corp.*, 481 N.W.2d 718 (Mich. App. 1992), *overruled on other grounds by Rafferty v. Markovitz*, 602 N.W.2d 367, 273 n.6 (Mich. 1999)). Under Michigan law, a directed verdict is appropriate where the plaintiff has failed to establish a prima facie case. *Morrow v. Bolt*, 512 N.W.2d 83, 85 (Mich. App. 1994). We review the evidence presented up to the time of the motion in the light most favorable to the nonmoving party, grant that party every reasonable inference, and resolve any conflict in the evidence in that party's favor to decide whether a question of fact existed. *Hatfield v. St. Mary's Med. Ctr.*, 535 N.W.2d 272, 274 (1995).

Pakenas makes three arguments with respect to the directed verdict.  First, she argues that when the district court granted State Farm's motion for directed verdict, exhibits had not yet been admitted into evidence and thus Pakenas had not been "fully heard."

Federal Rule of Civil Procedure 50 states:

> *If a party has been fully heard* on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . resolve the issue against that party; and . . . grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

(emphasis added).  Rule 50 does not explain what it is to be "fully heard."  The Advisory Committee note states, though, that "[i]n no event . . . should the court enter judgment against a party who has not been apprised of the materiality of the dispositive fact and been afforded an opportunity to present any available evidence bearing on that fact."  This court has stated that a party is not fully heard "if he is precluded from presenting the evidence he considers relevant."  *Jackson v. Quanex Corp.*, 191 F.3d 647, 657 (6th Cir. 1999).  At least one other court phrases what may ultimately be the same standard more tersely: "[A] party has been fully heard when he rests his case."  *Echeverria v. Chevron USA Inc.*, 391 F.3d 607, 611 (5th Cir. 2004).

Though Pakenas had undisputedly rested her case when the judge entered a directed verdict for State Farm, she  argues that she was not fully heard at that time because "much evidence had yet to be admitted and/or considered by Judge O'Meara."  Specifically, her proposed Exhibit 2 had not

yet been admitted.[9] Pakenas had moved to admit the exhibit during trial, but Judge O'Meara had not yet ruled on the motion when he granted the directed verdict.[10]

Though Exhibit 2 had not been officially entered into evidence when Judge O'Meara granted State Farm's motion for a directed verdict, Pakenas does not argue that she was prevented from presenting evidence from Exhibit 2 to the jury. Pakenas cites no law in support of her argument that a plaintiff has not been fully heard when evidence has been presented to the jury but has not been officially admitted into evidence. Review of the record shows that Pakenas fully presented her case and all of her evidence before she rested. The substance of Rule 50 was met. Thus, we decline to hold that she was not fully heard when the judge entered a directed verdict for State Farm.

Pakenas next argues that Judge O'Meara erred in granting the directed verdict because she had established a prima facie case for attendant-care benefits. To establish a prima facie case for breach of contract of Rogers's policy with State Farm, under the Michigan No Fault Act, the claims she presented in her complaint, Pakenas was required to prove that she had incurred allowable expenses. The No-Fault Act provides that "an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor

---

[9]Exhibit 2 is a 171-page file of documents that includes letters from Drs. Guidice and Verma, Rogers's doctors, both of whom testified at trial; the settlement papers from Rogers's previous lawsuit against State Farm; and invoices sent to State Farm, samples of which are reproduced *supra* note 6.

[10]Pakenas also argues that she had not been fully heard because defendant's Exhibit N had been admitted, but had not been reviewed by Judge O'Meara. This argument is very weak—not only can we not determine that Judge O'Meara had not "reviewed" the Exhibit, there is also no authority to suggest that a judge not having "reviewed" a piece of the defense's evidence prevents the plaintiff from being fully heard.

vehicle . . . ." MICH. COMP. LAWS § 500.3105. Complementary to this provision is M.C.L. § 500.3107(1), which states that "personal protection insurance benefits are payable for the following: . . . (a) Allowable expenses consisting of all *reasonable charges incurred for reasonably necessary* products, *services* and accommodations for an injured person's *care*, recovery, or rehabilitation." *Id.* (emphasis added). Pakenas bore the burden of proving that her expenses were (1) reasonable, (2) reasonably necessary, and (3) actually incurred. *Burris v. Allstate Ins. Co.*, 745 N.W.2d 101, 103–04 (Mich. 2008) . Michigan courts have made it clear that an insurer does not become liable for a payment "except on submission of evidence that services were actually rendered and of the actual cost expended." *Moghis v. Citizens Ins. Co. of America*, 466 N.W.2d 290, 292 (Mich. App. 1990) (citing *Manley v. Detroit Auto. Inter-Insurance Exch.*, 388 N.W.2d 216, 224 (Mich. 1986)).

Pakenas clearly failed to show that she incurred attendant-care expenses for 24/7 care. She and Rogers both admitted that they did not provide 24/7 care, and that Rogers in fact stayed by herself regularly, worked sometimes, and went to doctor's appointments by herself. Pakenas and Rogers were often just "on call," i.e., available by phone, in case Rogers needed something. Being available to provide attendant care (as is the case when a person is "on call") is not the same as *providing* attendant care. *See, e.g.*, *AT&T Wireless Servs., Inc. v. Castro*, 896 So. 2d 828, 831 (Fla. App. 2005) ("[A] caretaker cannot be compensated for time spent employed outside the claimant's presence, even if the caretaker is considered 'on call.' . . . [The] award of twelve hours of daily attendant care benefits improperly included this 'on call' care."); *cf.* 12 COUCH ON INSURANCE§174:23 (3d ed. 2011) ([R]ecovery is not permitted for those periods when the injured worker's relative is employed out of the home but 'on call' if needed by the employee.").

Further, though she and Mr. Rogers did present evidence that they sometimes provided care for Rogers, they did not provide a basis for the jury to come to any reasoned estimate of what the amount of care was. They testified that they scheduled her appointments, supervised her, provided companionship, and prevented her from wandering, among other services. However, Pakenas and Mr. Rogers's records are devoid of detailed descriptions of what kind of care they provided or the actual times of care provided. Pakenas billed State Farm in monthly increments without breaking out the services provided at what times, or how long it took to provide them. There was no way to tell from testimony the times that Rogers was cared for. A jury would have to speculate as to what amount of care was actually provided, and a jury cannot decide a damages award based on speculation. *See, e.g.*, *Melamed v. Lake Cnty. Nat. Bank*, 727 F.2d 1399, 1404 (6th Cir. 1984); *Gadula v. Gen. Motors Corp.*, No. 213853, 2001 WL 792499, at *2 (Mich. Ct. App. Jan. 5, 2001).

Because Pakenas failed to show that she incurred attendant-care expenses for 24/7 care, and failed to establish the amount of expense she actually did incur, the district court did not abuse its discretion when it determined Pakenas had not established her prima facie case, and that the case should not go before the jury.

Pakenas makes several other arguments in support of her claim that the district court erred in entering the directed verdict against her. She argues that State Farm's Rule 50(a) motion should not have been granted because State Farm made the motion verbally, with no brief in support. Pakenas did not object to State Farm's Rule 50(a) motion when it was made, and has failed to preserve the issue for appellate review. *See, e.g.*, *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d

1160, 1172 (6th Cir. 1996). However, her argument is meritless. An oral 50(a) motion is not prohibited, and State Farm's motion stated sufficient grounds to satisfy the rule. 9B WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL § 2353 (3d ed.) (Rule 50(a)(2) "does not require technical precision in stating the grounds of the motion. . . . Although it is said that the better practice is for the motion to be in writing, the rule contains no such requirement and an oral motion based on the record will suffice.").

Pakenas also argues that the district court erred because it granted the directed verdict on the "expenses not incurred" ground, which State Farm had not argued in its motion. Pakenas provides no legal authority for this argument. Because the district court possesses inherent power to direct a verdict on its own authority, this argument has no merit. *See, e.g.*, *Aetna Cas. & Sur. Co. v. Leahy Const. Co.*, 219 F.3d 519, 545–46 (6th Cir. 2000) ("[W]e find nothing improper about the district court rendering judgment on the issue of punitive damages sua sponte. Although judgment as a matter of law is normally entered by a district court following a meritorious motion, it is clearly within the court's power to do so on its own initiative.") (internal quotation marks omitted); FED. R. CIV. P.§ 50(a)(1).

Finally, Pakenas argues that the district court erred when it granted State Farm's 50(a) motion while plaintiff's counsel was absent from the court due to serious illness. Pakenas does not cite to any legal authority to support her claim, nor has any such authority been found. The fact that the district court acted in absence of plaintiff's counsel, though not a commendable practice, does not mean that the district court could not grant an otherwise legitimate directed verdict.

No. 09-2305
*Pakenas v. State Farm Insurance Company*

*Motion for a New Trial*

We review the grant or denial of a motion for a new trial for an abuse of discretion—the court "should deny the motion if the verdict is one that could reasonably be reached, regardless of whether the trial judge might have reached a different conclusion were he the trier of fact." *Wayne v. Village of Sebring*, 36 F.3d 517, 525 (6th Cir. 1994).

Pakenas provides a number of bases for her argument that the district court abused its discretion. The only argument relevant here is that the district court abused its discretion because Judge O'Meara was personally biased against Pakenas, and that she was denied a fair trial before an impartial decision-maker.

However, this argument is belied by Judge O'Meara's own reasoning for granting the motion for directed verdict—he believed that the "jury had no reasonable basis to award 24-hour-per-day attendant care and no reasonable basis to estimate how much care, if any, was actually provided." The evidence, in fact, supports Judge O'Meara's stated reason. He clearly had a reasonable basis, other than personal bias, for his decision. Therefore, it is impossible to say that he abused his discretion by denying Pakenas's motion for a new trial due to bias against her.

*Motion for a Mistrial*

We review the decision not to grant a mistrial for an abuse-of-discretion standard. *United States v. Wheaton*, 517 F.3d 350, 361 (6th Cir. 2008).

Pakenas argues that the district court erred in denying her motion for a mistrial. She based her motion on the fact that juror Mr. Harvey's wife was present in the courtroom when Judge

- 21 -

O'Meara stated that he thought the plaintiff might have committed fraud. Though the jury was not in the courtroom when Judge O'Meara said this, Pakenas argues that Mrs. Harvey undoubtedly told Mr. Harvey what she had heard. Pakenas argued in her motion of a mistrial that Harvey must be stricken from the jury, but also that no curative instructions could "obviate the possibility of . . . inadvertent jury tampering," and grant of a mistrial was necessary. Pakenas does not provide legal authority for her argument, nor does she provide further information to suggest that Judge O'Meara's comments were heard or learned of by the jury.

At the beginning of trial and a number of times thereafter, Judge O'Meara admonished the jury not to discuss the case "with anyone, including your family, neighbors, friends, business associates, *fellow jurors*, at any time during the trial." (emphasis added). Though Pakenas's argument that the juror's wife could have told Mr. Harvey what Judge O'Meara said about Pakenas, and that Mr. Harvey could have then told other jurors, is within the realm of possibility, it is highly speculative. Judge O'Meara had admonished the jury not to speak to each other about the trial. Further, he dismissed Mr. Harvey from the jury. His subsequent refusal to grant a mistrial was not an abuse of discretion, absent further evidence that jurors had learned of or been influenced by his statements. We affirm the district court's denial of Pakenas's motion for a mistrial.

*Attorney's Fees*

Pakenas's final argument on appeal is that the district court erred in awarding State Farm $212,380 in attorney's fees. She argues that State Farm cannot satisfy M.C.L. § 500.3148(2)'s

requirement that there was "no reasonable foundation" for her claims.[11]    She argues that the evidence presented at trial was too substantial and meritorious to allow such a conclusion to be drawn.

In general, a party cannot recover attorney's fees unless a statute, court rule, or judicial exception specifically allow it. *Shanafelt v. Allstate Ins. Co.*, 552 N.W.2d 671 (1996). Michigan's no-fault automobile-insurance act, the act under which this suit was brought, contains a provision allowing the award of attorney's fees to an insurer for defending against a claim that was in some respect fraudulent or so excessive that it had no reasonable foundation. M.C.L. 500.3148(2). We review a lower court's decision to grant or deny attorney's fees for an abuse of discretion. However, the court's findings regarding the fraudulent, excessive, or unreasonable nature of a claim under M.C.L. 500.3148(2) are reviewed for clear error. *Beach v. State Farm Mut. Auto. Ins. Co.*, 550 N.W.2d 580, 587 (1996).

The district court did not abuse its discretion in awarding attorney's fees to State Farm. The court relied on cases in which attorney's fees were awarded after plaintiffs were awarded "vastly compromised sums." In one, the plaintiff demanded $158,000, later waived all but $82,000 in medical expenses, and was awarded only $5,920—$4,000 in medical expenses and $1,920 in interest. The Michigan Court of Appeals reversed the trial court's decision not to award defendant attorney's fees, stating that, "[A] $4,000 verdict on an $82,000 claim is evidence that the jury found

---

[11]The statute provides: "An insurer may be allowed by a court an award of a reasonable sum against a claimant as an attorney's fee for the insurer in defense against a claim that was in some sense fraudulent or so excessive as to have no reasonable foundation . . . ." State Farm requested attorney's fees based on the "so excessive as to have no reasonable foundation" ground.

that plaintiff's claim was in some respect fraudulent or so excessive as to have no reasonable foundation, and remand for the award of a reasonable sum." *Robinson v. Allstate Ins. Co.*, No. 244824, 245363, 2004 WL 1057811, at *1–2 (Mich. Ct. App. May 11, 2004). In another case, the jury awarded $34,000 rather than the $164,000 plaintiff had demanded. *Stoops v. Farm Bur. Ins. Co.*, No. 260454, 261917, 2006 WL 751404, at *5 (Mich. Ct. App. Mar. 23, 2006). The jury also marked on a special verdict "yes" to the question of whether plaintiff's attendant-care claim was excessive. *Ibid.* State Farm argues that, similar to the situation in these cases, the fact that Pakenas received a "vastly compromised" sum—in fact, zero—demonstrates that her claims were in "some respect fraudulent or so excessive as to have no reasonable foundation." M.C.L. 500.3148(2).

Pakenas's case differs from the persuasive authority cited by State Farm because there is no case considering a court awarding a defendant attorney's fees under M.C.L. 500.3418(2) after the court granted a directed verdict for the defendant. However, the record is replete with evidence that Pakenas's claims were excessive or in some way fraudulent. She and Mr. Rogers did not actually provide 24-hour care to Rogers. The fact that State Farm had to file numerous pretrial motions to compel depositions, discovery, and an independent medical exam suggest that Pakenas might be making an excessive or fraudulent claim. Judge O'Meara's statements in court made clear that he believed Pakenas had perpetrated fraud. Further, though Pakenas and Mr. Rogers may have received advice from treating physicians that they provide 24-hour care, and though they did provide some care, they were fully aware that they left Rogers alone for significant periods of time. Finally, though, unlike in *Robinson* or *Stoops*, there was not a jury verdict that was far less than what Pakenas demanded, a directed verdict, along with the judge's statement to the jury that he would have set

aside a judgment for the plaintiff, is perhaps stronger evidence that Pakenas's claims were excessive or fraudulent. A directed verdict is a clear sign that the proper award is not just small—it is zero.

Based on the weight of evidence, the district court's determination that Pakenas's claims were excessive or in some way fraudulent was not clearly erroneous. We affirm the district court's award of attorney's fees under M.C.L. 500.3148(2).

III

For the foregoing reasons, we AFFIRM the district court's entry of directed verdict for State Farm, we AFFIRM the district court's denial of Pakenas's motions for a mistrial and for a new trial, and AFFIRM the district court's grant of attorney's fees.