**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0564n.06

**No. 11-2491**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td rowspan="9">**FILED**<br>***Jun 11, 2013***<br>DEBORAH S. HUNT, Clerk</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Plaintiff-Appellee,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>DAJUAN LAMARR WREN</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Defendant-Appellant.</td><td>)</td></tr>
</table>

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

Before:  MARTIN and COOK, Circuit Judges; GRAHAM, District Judge[*]

COOK, Circuit Judge.  Following convictions for conspiracy to possess with intent to distribute heroin and felon in possession of a firearm and ammunition, defendant Dajuan Wren appeals, challenging the denial of his motions to suppress evidence obtained by a search warrant and wiretaps, the sufficiency of the evidence for his convictions, and the reasonableness of his sentence. We AFFIRM.

I.

The DEA began investigating co-defendant Michael Cathey aka "Moe Green" after receiving information about his involvement in narcotics trafficking.  The DEA identified Dajuan Wren as

_____

[*]The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

Cathey's heroin supplier. DEA Special Agent Bryan Sartori observed an encounter between Wren's white Range Rover and Cathey's car. Wren and Cathey's cars pulled next to one another briefly before going their separate ways. Approximately 50 minutes after this meeting, a wiretap recorded Cathey telling an associate that he had a new source of heroin.

Two days later, additional intercepted calls between Cathey and Wren alerted Sartori that the two planned to meet that day. Sartori followed Cathey as he went to a nearby hotel where he noticed the white Range Rover parked. Cathey exited the hotel's bar area fifteen minutes later and left the hotel. A credit card receipt showed Wren stayed at the hotel during this time.

Cathey spoke to Antonio Simmons, a co-defendant, after the hotel meeting. Sartori interpreted the call to mean that Cathey had just obtained narcotics. Another intercepted call between Wren and Cathey informed the DEA that they were going to conduct a transaction in which Wren's vehicle would approach Cathey's car and Wren would roll down his back window. Soon after, Sartori observed Cathey's vehicle approach Wren's white Range Rover, before the two suddenly drove away. Authorities pulled over Cathey because he was the target of the investigation at that time and seized $18,000.

The DEA executed a search warrant at 137 Allenhurst Avenue, a residence owned by Wren that the DEA had staked out. Inside the residence's master bedroom, the DEA found a money counter, a bag containing over $50,000 (rubber-banded and vacuum sealed in plastic), a vacuum

sealer with plastic packaging, a package of rubber gloves, and rubber bands. Agents also found a gun safe containing a 100-round drum magazine for an assault rifle in the bedroom.

The government also presented evidence of a drug ledger found in the master bedroom at the Allenhurst house. One name found in the ledger was "Razor" or "Razor Blade," whom authorities identified as co-defendant David Wynn. Wynn testified that Wren supplied him with 250 grams of heroin for $20,000. There was also an entry for a sale to "Moe," indicating Wren sold Cathey 200 grams of heroin for $15,000.

In the residence's attached garage, agents found a loaded Glock 9mm, semi-automatic handgun with an extended magazine and laser sight in the glove compartment of a 2007 burgundy Mercedes. The vehicle's certificate of title was found in the residence and listed Dirty Glove Entertainment, Wren's company, as the owner.

The government indicted Wren for conspiracy to possess with intent to distribute heroin, in violation of 21 U.S.C. §§ 841 and 846, and felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g). Wren filed motions to suppress evidence seized from wiretaps and from the search of 137 Allenhurst. The district court denied these motions. After a jury trial, Wren was convicted of both charges and received a 216-month sentence. Wren timely appeals, challenging the denial of his motions to suppress, the sufficiency of the evidence underlying his convictions, and the reasonableness of his sentence.

II.

*A. Suppression of Evidence*

*1. The Search Warrant*

Wren challenges the validity of the warrant issued to search his home for lack of probable cause. We bypass the probable-cause inquiry because we conclude that the officers relied in good faith on a facially-valid warrant issued by a "neutral and detached" magistrate. *See United States v. Leon*, 468 U.S. 897, 905, 913–15, 922 (1984) (citation and internal quotation marks omitted). Under the good-faith exception to the exclusionary rule, courts should not suppress "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (en banc) (quoting *Leon*, 468 U.S. at 922) (internal quotation marks omitted). An officer's reliance on a warrant is objectively unreasonable when the affidavit so lacks indicia of probable cause that it "states suspicions, or conclusions, without providing some 'underlying factual circumstances regarding veracity, reliability, and basis of knowledge.'" *United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998) (citation omitted); *accord United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005). This court reviews de novo the applicability of the good-faith exception. *United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004).

The facts set forth in Special Agent Sartori's affidavit evidence the agents' objective reasonableness in relying on the search warrant. Sartori observed what he believed to be two narcotics transactions between Cathey and Wren, and both involved Wren's white Range Rover. Corroborating one of these transactions, co-defendant Simmons told Sartori that he met Cathey because Cathey wanted him to "mix" or "cut" heroin Cathey had received from Wren. A public database listed Wren as the owner of 137 Allenhurst, and Wren's white Range Rover was parked there. The affidavit connected Wren to the residence and to the white Range Rover, and also connected the Range Rover to the residence. The agents' reliance on the search warrant was objectively reasonable. *See Washington*, 380 F.3d at 243 (citation and internal quotation marks omitted) (good-faith exception met where "[t]here was a visible nexus connecting [the defendant] to the house, [the defendant] to the [the car], and the [car] to the house"). We therefore affirm the district court's denial of the motion to suppress evidence seized from 137 Allenhurst.

*2. The Wiretap*

Wren also asserts that the affidavit supporting authorization of the wiretaps lacked a showing of necessity.

A law-enforcement official's application for wiretap authority requires "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This ensures that a wiretap is not used as the initial step in an investigation or when more traditional

investigative techniques could suffice. *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007). Law enforcement officials must give serious consideration to non-wiretap techniques prior to applying for wiretap authority and explain why, under the particular circumstances, such techniques would be, or are, inadequate. *United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002). The government is not required to show the impossibility of other means of obtaining information and the mere fact that some investigative techniques produced evidence does not foreclose the need for a wiretap. *Id.* "Generally, a district court's finding that the requirements of § 2518(1)(c) have been met are afforded considerable discretion." *Id.* at 304 (citation and internal quotation marks omitted).

Wren attacks Special Agent Sartori's affidavit in support of the wiretap, claiming the statement of necessity was "simply boilerplate language and mere opinion" and applies in most narcotic investigations. Reading the affidavit as a whole, *United States v. Landmesser*, 553 F.2d 17, 20–21 (6th Cir. 1977) (explaining that generalized conclusions do not negate a finding of necessity when read in conjunction with the entire affidavit), the fact that some of Special Agent Sartori's language could apply to most narcotics investigations does not render the affidavit insufficient. *See id.* at 20. Congress intended the necessity requirement to "be tested in a practical and common sense fashion." *Id.* (citation and internal quotation marks omitted).

The entire affidavit, notwithstanding any "boilerplate" or "mere opinions," demonstrates that the government seriously considered non-wiretap techniques and it explained why such techniques would be inadequate under the circumstances. Special Agent Sartori's affidavit included a detailed

summary of the investigative techniques used prior to seeking the wiretap. This included searches of Cathey's residence and vehicles, interviews with Cathey and those who had dealings with him, multiple confidential sources and a cooperating defendant, unrecorded meetings between confidential sources and Cathey, recorded calls between a confidential source and Cathey at the direction and under the supervision of the DEA, phone records, pen registers, and surveillance.

Sartori followed this summary with a ten-page, nineteen-paragraph statement as to why a wiretap was necessary. Sartori referred to previous investigatory efforts and explained why they were unlikely to provide a clearer picture of Cathey's drug organization. For example, the four confidential sources and one cooperating defendant provided the government with useful evidence; much of the evidence, however, was historical and did not provide a clear picture of the organization. Confidential informants could not identify the breadth of Cathey's operations, all the sources of supply, stash locations, or distribution activity. Cathey trusted a confidential informant, but kept that informant from meeting his drug supplier. Due to the compartmentalized structure of the organization, an undercover agent was unlikely to produce helpful evidence and electronic surveillance was needed to further identify Cathey's sources and other accomplices.

Moreover, Sartori explained that Cathey was difficult to track; he moved residences and frequently switched vehicles, preventing the use of a vehicle-tracking devices. Last, drug trafficking takes place through cell phones, requiring wiretaps to understand the scope of the organization and identify its members. *See Stewart*, 306 F.3d at 305–06 (citations and internal quotation marks

omitted) ("We have previously recognized that wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." ). Sartori's affidavit satisfies 18 U.S.C. § 2518's necessity requirement, as it established that the government previously tried other, unavailing investigative procedures.

*B. Sufficiency of the Evidence*

We generally review sufficiency-of-the-evidence claims to determine whether "any rational trier of fact could find the elements of the crime beyond a reasonable doubt," and, in doing so, "view[] the evidence in the light most favorable to the prosecution, . . . giving the government the benefit of all inferences that could reasonably be drawn from the testimony." *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 589 (6th Cir. 1999) (emphasis omitted) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Defendants asserting such claims "bear[] a very heavy burden," *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986) (citation and internal quotation marks omitted), and an appellate court will only set aside the judgment if, after viewing the record as a whole, it determines that "the judgment is not supported by substantial and competent evidence," *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991).

*1. Felon in Possession of a Firearm and Ammunition*

Wren argues the government did not prove he knowingly possessed the firearm or ammunition. Circumstantial evidence of actual or constructive possession is sufficient to sustain a

verdict.  *United States v. Bailey*, 553 F.3d 940, 944 (6th Cir. 2009); *United States v. Moreno*, 933 F.2d 362, 373 (6th Cir. 1991).  Constructive possession exists when a defendant "knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others."  *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998) (citation and internal quotation marks omitted).  Presence alone is not enough, but "[p]roof that the person has dominion over the premises where the firearm is located is sufficient to establish constructive possession."  *Id.* (citations and internal quotation marks omitted); *accord Bailey*, 553 F.3d at 945 (citation omitted).  Where the defendant shares possession of the premises where contraband is found, additional incriminating evidence must show the defendant knew of and controlled the contraband.  *Bailey*, 553 F.3d at 944 n.3.  A connection or nexus must exist between the firearm and the defendant.  *See id.* at 945–46.  When the defendant is in close proximity to the firearm, the inference of dominion and control is particularly strong, and thus less incriminating corroborative evidence suffices.  *United States v. Grubbs*, 506 F.3d 434, 439–40 (6th Cir. 2007).

The government presented evidence sufficient to allow a rational jury to find that Wren knowingly had the power and intention to exercise dominion and control over the ammunition.  Wren had dominion over the premises where the ammunition was found.  He held title to 137 Allenhurst and was sleeping there when agents executed the search warrant.  The government presented evidence that ammunition for the assault weapon was found in an unlocked safe in Wren's bedroom, next to where Wren was sleeping.  Photographs of an assault rifle with a similar 100-round drum magazine attached to it were found on Wren's phone.

The government also presented sufficient evidence to allow a rational jury to find Wren constructively possessed the loaded Glock 9mm. Agents found Wren at home and the loaded gun in his Mercedes (in his attached garage) when they conducted the search. Also, trial testimony confirmed that the car was Wren's, that he drove it, and that he drove it to Cathey's carwash for detailing. *Cf. Bailey*, 553 F.3d at 945 (no constructive possession of gun found in stolen vehicle driven by defendant).

Wren cites two cases, one overruled by this court sitting en banc, for the proposition that his presence near the firearm is not enough for constructive possession. These cases, however, differ in important ways. *See United States v. Arnold*, 434 F.3d 396, 399 (6th Cir. 2005) (per curiam) (defendant did not own the car where the firearm was found), *rev'd en banc*, 486 F.3d 177, 184 (6th Cir. 2007) (sufficient evidence supported possession of the firearm); *United States v. Beverly*, 750 F.2d 34, 35–37 (6th Cir. 1984) (defendant did not own the residence where the firearm was found)*; cf. Grubbs*, 506 F.3d at 440–41 (explaining the inference of dominion and control is particularly weak where firearm is found in another's home and requires significantly more persuasive evidence).

Though Wren presents evidence that his live-in girlfriend owned the ammunition and firearm at the Allenhurst address, Wren could constructively possess them through her. *See Kincaide*, 145 F.3d at 782 (citation omitted). While his girlfriend testified that she put the gun in his burgundy Mercedes and had been driving the car, the jury could disbelieve this testimony.

In sum, Wren fails to carry his "very heavy burden." *Vannerson*, 786 F.2d at 225. Sufficient evidence allowed the jurors to find that Wren knowingly had the power and intent to exercise dominion and control over the ammunition and the Glock 9mm.

*2. Drug Trafficking Conspiracy*

Wren also argues insufficiency on the drug trafficking conspiracy conviction (§§ 841 and 846). A drug conspiracy conviction requires: (1) an agreement to violate drug laws; (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy. *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005). "[P]roof of a formal agreement is not necessary; 'a tacit or material understanding among the parties' will suffice." *United States v. Avery*, 128 F.3d 966, 970–71 (6th Cir. 1997) (quoting *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990)). We may infer the existence of a conspiracy from circumstantial evidence, and we can infer a particular defendant's participation in the conspiracy from his conduct. *Martinez*, 430 F.3d at 330. Once the government has shown the existence of a conspiracy, the defendant's involvement with the conspiracy "need only be slight." *Avery*, 128 F.3d at 971; *accord United States v. Henley*, 360 F.3d 509, 514 (6th Cir. 2004).

Wren mounts three challenges to the evidence supporting his conviction: (1) he was never observed selling or possessing drugs; (2) the ledger offered by the government recorded his music business, not a drug business; and (3) unlike typical drug dealers, his assets were unconcealed. None of these challenges undermine the jury's verdict.

Co-defendant Wynn testified that Wren sold him 250 grams of heroin for $20,000. Special Agent Sartori observed one suspected drug transaction between Cathey and Wren, and approximately fifty minutes later Cathey told another individual about a new heroin source. Sartori also watched a suspected drug transaction two days later, after which he heard Cathey tell an associate he just grabbed "big boy," which Special Agent Sartori explained was code for heroin. Later that day, Sartori observed Cathey and Wren meet in their vehicles before agents stopped Cathey and seized $18,000.

The DEA obtained additional incriminating evidence from Wren's residence, including a loaded Glock 9mm, money counter, vacuum sealer, ammunition for an assault rifle, $53,004 in cash (most of which was vacuum sealed), rubber gloves, and rubber bands. The government argued that the DEA found a drug ledger in the residence used to record drug transactions. Though Wren argues that he used the ledger for his recording studio business, it contained references to "Razor" and "Razor Blade" (who was identified as Wynn), corroborating both Wynn's testimony that Wren sold him 250 grams of heroin for $20,000 and Cathey's purchase of 200 grams of heroin for $15,000.

Wren argues that most drug dealers conceal their assets, and that because his were "an open book," the government should not be able to convict him. Yet, reviewing the evidence in the light most favorable to the prosecution, and drawing all reasonable inferences in the government's favor, a rational factfinder could find that Wren participated in the conspiracy. *See Martinez*, 430 F.3d at 330.

*C. The Reasonableness of the Sentence*

*1. Procedural Reasonableness*

We review the district court's sentence for reasonableness under the deferential abuse of discretion standard, which has both procedural and substantive components. *Gall v. United States*, 552 U.S. 38, 46, 51 (2007). The Supreme Court in *Gall* defined procedural error as "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id.* at 51. Procedural reasonableness, however, does not require the district court to address "any and all arguments" for alternative sentences, *United States v. Vonner*, 516 F.3d 382, 387 (6th Cir. 2008) (en banc), so long as the context and record "'make clear' the court's reasoning," *United States v. Liou*, 491 F.3d 334, 339 n.4 (6th Cir. 2007) (quoting *Rita v. United States*, 551 U.S. 338, 357 (2007)).

Wren argues that the district court improperly applied Guidelines Section 2D1.1(b)(1). Under that provision, a two-level enhancement may be added to the base offense level of a defendant convicted of a drug offense "'[i]f a dangerous weapon (including a firearm) was possessed'" during the offense. *United States v. Greeno*, 679 F.3d 510, 514 (6th Cir. 2012) (quoting U.S.S.G. § 2D1.1(b)(1)). "The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id.* (quoting U.S.S.G. § 2D1.1 cmt. n.3(A)). For the two-level enhancement to apply, the government has the initial burden of showing

by a preponderance of the evidence: (1) the defendant actually or constructively "possessed" the weapon, and (2) such possession was during the commission of the offense. *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007). To show the weapon was possessed during the commission of the offense, all the government must show is possession of the dangerous weapon during the "relevant conduct," which includes "'all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" *United States v. Faison*, 339 F.3d 518, 520 (6th Cir. 2003) (quoting U.S.S.G. § 1B1.3(a)(2)). Once the government shows the dangerous weapon was possessed during the relevant conduct, the burden shifts to the defendant to show it was "clearly improbable" the weapon was connected to the offense. *See Catalan*, 499 F.3d at 606.

We will not set aside the district court's factual determinations supporting Wren's enhancement unless clearly erroneous. *See United States v. Wheaton*, 517 F.3d 350, 367 (6th Cir. 2008) (citation omitted). "A finding of fact is clearly erroneous when, although there may be some evidence to support the finding, the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed." *Id.* (citation and internal quotation marks omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)).

Wren challenges the evidence supporting the enhancement, noting the absence of evidence linking him to the firearm and the firearm to the conspiracy, and pointing to defense evidence

attributing the gun to his girlfriend. We consider the following factors, none of which controls, when determining whether the two-level enhancement was appropriate:

> (1) the type of firearm involved; (2) the accessibility of the weapon to the defendant; (3) the presence of ammunition; (4) the proximity of the weapon to illicit drugs, proceeds, or paraphernalia; (5) the defendant's evidence concerning the use of the weapon; and (6) whether the defendant was actually engaged in drug-trafficking, rather than mere manufacturing or possession.

*Greeno*, 679 F.3d at 515 (citations omitted).

Though Wren presents evidence of Ogen's ownership and possession of the firearm, as we held above, sufficient evidence supported Wren's constructive possession during the conspiracy. The government also presented evidence that the firearm was connected to the conspiracy. The DEA found a loaded Glock 9mm revolver with an extended magazine and laser sight in Wren's car. *See United States v. Williams*, 345 F. App'x 979, 980 (6th Cir. 2009) (per curiam) (noting that the Glock semi-automatic handgun is a type of weapon used by drug traffickers). He had ready access to the gun in the glove compartment of a car he drove to a co-conspirator's business. The DEA found two types of ammunition in Wren's bedroom, near approximately $50,000 in cash, which was vacuum sealed, and different paraphernalia relating to the conspiracy including a vacuum sealer, a money counter, and a drug ledger. Wren's evidence does not make it "clearly improbable" that the 9mm was connected to the drug conspiracy, and the district court could reasonably conclude that the preponderance of the evidence pointed the other way. *See Faison*, 339 F.3d at 518–21 (affirming two-level enhancement for possession of a firearm during a conspiracy); *see also United States v.*

*Milan*, 218 F. App'x 492, 495 (6th Cir. 2007) (same). Wren fails to show clear error in the district court's factual determination that he possessed a firearm during the conspiracy.

      *2. Substantive Reasonableness*

      Wren also argues that his 216-month sentence was substantively unreasonable. A sentence may be substantively unreasonable when, for example, the court "selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008) (citing *United States v. Webb*, 403 F.3d 373, 385 (6th Cir. 2005)). "The essence of a substantive-reasonableness claim is whether the length of the sentence is 'greater than necessary' to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a)." *United States v. Tristan–Madrigal*, 601 F.3d 629, 632–33 (6th Cir. 2010). Wren's sentence was within the guidelines range and so is presumptively reasonable. *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007).

      Wren argues that the court failed to fully consider his history and characteristics. *See* 18 U.S.C. § 3553(a)(1). Specifically, he argues that certain personal characteristics in the presentence report such as his ownership of his own business and history of mental stability were not addressed at sentencing. We have never required a "ritual incantation" of the § 3553(a) factors to affirm a sentence. *United States v. Caswell*, 456 F.3d 652, 657 (6th Cir. 2006). We will sustain the sentence where the record reflects that the district court considered the factors. *Id.*

Sufficient evidence supports the view that the district court considered Wren's history and personal characteristics. The court noted Wren's "entrepreneurial spirit" and "talents as an entrepreneur of his chosen profession as a rap producer," citing the PSR. The district court went through Wren's numerous objections to the PSR and gave each side time to address the objections. The district court also provided Wren with an opportunity to discuss any factor that may impact his sentence. The sentencing transcript thus shows that the court adequately considered Wren's history and characteristics. *See Caswell*, 456 F.3d at 657–58 (rejecting sentencing challenge where defendant's personal history was sufficiently considered as the district court spoke on the defendant's childhood, allowed the defendant to describe his childhood before sentencing, and defendant's personal history was in the presentence investigation report which was relied on in the sentencing decision).

Given that the sentencing court considered Wren's history and personal characteristics, Wren fails to rebut his sentence's presumed reasonableness.

### III.

For these reasons, we AFFIRM.