NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0128n.06

Case No. 17-6470

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Mar 18, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE MIDDLE DISTRICT OF |
| TROY ANTHONY MCFARLAND, SR., | ) | TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| _____/ | | |

Before: KEITH, MERRITT, and LARSEN, Circuit Judges.

**DAMON J. Keith, Circuit Judge.** Appellant Troy McFarland, Sr. ("McFarland") is serving a 200-month federal sentence for conspiring to distribute a controlled substance. After a wiretap investigation led to his arrest, agents searched his residence and found drugs, drug paraphernalia, and two firearms. He was charged with a single count on a multi-count, multi-defendant indictment, and pled guilty without a plea agreement. McFarland's Sentencing Guidelines calculations included enhancements for firearm possession and for being a leader in a conspiracy. McFarland appeals his below-Guidelines sentence. For the reasons that follow, we **AFFIRM** McFarland's sentence.

**I.**

**A. Investigation and Arrest**

McFarland was charged with a single count of conspiring to distribute Oxycodone, Oxymorphone, and Hydromorphone in violation of 21 U.S.C. §§ 841(a)(1), 846. The count contained four co-defendants: Daunte Lillard ("Lillard"), Troy McFarland, Jr. ("McFarland, Jr."), Rachel Siegelman ("Siegelman"), and Willie Thompson ("Thompson"). The events leading up to and surrounding his arrest are as follows.

From September 2014 through April 2015, the Drug Enforcement Administration ("DEA") investigated the distribution of diverted prescription pills and heroin in the Middle District of Tennessee. As a part of this investigation, DEA agents used wiretaps to intercept calls and text messages between the co-conspirators.

In February 2015, DEA agents intercepted a call between McFarland and Lillard, a co-defendant, in which McFarland instructed Lillard to deposit money into two bank accounts belonging to Tyesha Braithwaite. McFarland told Lillard to go to two different banks to avoid detection by authorities. A DEA agent testified at McFarland's sentencing hearing that McFarland supplied diverted pills to Lillard. In a second call that same day, McFarland also told Lillard that he bought ten phones to hand out to his organizational members, and explained that if members only used the phones to communicate with each other, law enforcement could not intercept their calls. Later that month, DEA agents intercepted another call, in which McFarland instructed Lillard to deposit money into another account, this time belonging to Matthew Henson, and provided Lillard with the account number.

On April 7, 2015, Los Angeles Sheriff's Department officers stopped Shantoya Fannin ("Fannin") at the Los Angeles International Airport ("LAX"), where they seized $20,260

concealed inside toiletry boxes within her suitcase. Agents searched her phone, and discovered that about a week earlier, Fannin texted McFarland and told him that she needed money. From the text messages, agents learned that on April 3, 2015, McFarland arranged for Fannin to fly to Nashville from Los Angeles, where McFarland, Jr. picked her up from the airport and drove her to a Marriott Hotel. Two days later, agents believe that Siegelman—another co-defendant—gave Fannin the money. Fannin returned to Los Angeles the next day, where she was detained. Fannin told agents that she was to receive $2,000 for transporting the money. Shortly after she was stopped, agents intercepted a phone call from Fannin to McFarland that lasted about seven minutes. Within minutes after speaking with Fannin, McFarland called Lillard and said, "throw that phone away" and "kill the line." Agents believe that McFarland instructed Lillard to discard his cellphone because the money was seized.

Twelve days later, using GPS data from McFarland's cellphone, agents learned that he was near a home located at 712 Cielo Vista Road in Lexington, Kentucky. While conducting surveillance, agents noticed a blue Chrysler and a gold Hyundai frequenting the home. After detecting McFarland's phone leaving the area, Kentucky State Police conducted a traffic stop on McFarland's vehicle—the blue Chrysler. McFarland consented to a search of his vehicle, and the state trooper found $5,000 cash on McFarland's person, as well as the cellphone agents were tracking. McFarland was arrested for driving on a suspended license, and was picked up by McFarland, Jr. after being released from custody on bond. Agents used cellphone data to track McFarland traveling in McFarland, Jr.'s vehicle, and observed the gold Hyundai following McFarland, Jr. Officers stopped and searched both vehicles, but no guns or drugs were found. The driver of the gold Hyundai was identified as Siegelman.

Later that day, agents intercepted a call between Lillard and co-defendant Thompson discussing what agents believed was the impending sale of pills at the Marriott Courtyard Hotel. Agents observed Lillard, Thompson, and McFarland, Jr. meeting in the hotel parking lot, and approached their vehicles. When police ordered McFarland, Jr. out of Lillard's vehicle, McFarland, Jr. reached into his pants and threw a large amount of cash—later determined to be approximately $24,000—on the vehicle's console. Agents arrested the men, and afterwards went to a hotel room registered under the name "McFarland." McFarland and Siegelman were in the hotel room, and agents took them into custody. Upon executing a search warrant on the hotel room, agents found and seized large amounts of diverted prescription pills, many that were in plain view and others that were concealed inside large vitamin bottles. After testing, it was determined that agents seized 871 Oxycodone 30-mg pills, 1,280 Oxymorphone 40-mg pills, and 945 Hydromorphone 4-mg pills.

Agents later learned that McFarland leased the Cielo Vista Road residence. Before executing a search warrant, agents knocked on the front door of the residence. A man and woman answered the door, and told agents that they received a late-night jail phone call from McFarland, who told them that the back door was unlocked and that they could stay at the residence while they were on vacation from California. After consenting to a search of their vehicle, the couple left the home. Agents also spoke with a neighbor, who said she observed a man matching McFarland's description driving a dark blue or black Chrysler frequently park on the side street and go in and out of the back door of the residence. The agent showed the neighbor a picture of Siegelman, who the neighbor said she saw at the residence on a regular basis.

After obtaining a search warrant, agents searched the premises, where they found male and female clothes in the master bedroom. Agents also found McFarland's driver's license and letters

addressed to him on a nightstand. Hydrocodone pills, Oxycodone pills, and crack cocaine were found in the master bedroom, along with Siegelman's passport and other documents containing her name. Agents also found a computer with "Troy McFarland" displayed above a password bar on the screen, and the lease to the residence with McFarland's name on it elsewhere in the residence.

Agents found marijuana, Xanax pills, and heroin in the kitchen, and a kilo-press in the dining room. Elsewhere, agents located items consistent with drug trafficking, including four cellphones, cutting agents, electrical tape, gloves, masks, charcoal, food saver/sealer machines, and packaging materials.

In the attic, agents discovered a Helwan nine-millimeter handgun and magazine, and a Draco assault rifle and magazine. These weapons were sealed in what appeared to be the same packaging material found downstairs. Agents also found heroin sealed in packaging material in the attic about eight to ten feet away from the firearms.

**B. Sentencing Hearing**

On October 12, 2016, McFarland pled guilty without a plea agreement to a single count of conspiracy to distribute controlled substances. The probation office prepared a Presentence Report ("PSR") with a Guidelines calculation. After receiving a two-point enhancement for possessing a firearm and a four-point enhancement for leadership in criminal activity involving five or more participants, McFarland received a total offense level of 33. *See* U.S.S.G. § 2D1.1(b)(1); U.S.S.G. § 3B1.1(a). For these charges, his criminal history category was five. This resulted in an advisory Guidelines range of 210 to 240 months imprisonment. The Government requested that the district court impose a sentence of 210 months.

McFarland filed objections to these enhancements. He first argued that the two-point firearm enhancement was unwarranted because the Government did not prove that he constructively possessed the firearms found in the attic, or that the firearms were connected to the offense. The district court overruled this objection, noting that because McFarland leased the premises and that his clothes and drugs were in proximity to the firearms "[i]t's clear that he had constructive possession." The district court also found that McFarland had not shown that it was clearly improbable that the firearms were connected to the offense.

McFarland also argued that he only deserved a two-point enhancement for leadership under § 3B1.1(c) because he only exercised control over one person, Shantoya Fannin. The district court overruled this objection, finding that McFarland was the leader of five or more people in a conspiracy.

Additionally, McFarland filed a motion in which he requested "a mitigated sentence and departure/variance below the sentencing guidelines." He provided several arguments for a mitigated sentence and claimed that his criminal history was overstated. The district court denied his motion, finding that McFarland's criminal history was not mitigated by the facts he presented.

In support of his argument for a variance, McFarland presented two witnesses at sentencing. First, Tyesha Braithwaite, testified that McFarland was a hands-on caregiver to their disabled son. Next, McFarland's mother, Sara Allen, testified to McFarland's challenging childhood, which included him being bullied because of his mother's sexuality. McFarland also argued for a variance to avoid unwarranted sentencing disparity by presenting evidence of defendants who received lesser sentences than McFarland's Guidelines range for trafficking similar drugs.

After acknowledging that the Guidelines are advisory and considering "the totality of all the facts involved in [this] case," the district court concluded that there were "some redeeming factors about [McFarland] that perhaps might warrant a variance," and sentenced McFarland to 200 months in prison.

**II.**

On appeal, McFarland argues: 1) the district court erred in increasing his offense level by two points for possessing a firearm; 2) he should not have received a four-point enhancement for leadership in criminal activity involving five or more participants; 3) his criminal history is overstated; and 4) the district court did not adequately meet the requirements of 18 U.S.C. § 3553 in fashioning his sentence.

**A. Firearms Enhancement**

McFarland first argues that the district court erred when it increased his offense level by two points for possessing a firearm in connection with the offense under U.S.S.G. § 2D1.1(b)(1). Specifically, he argues that the Government's evidence did not establish that he was in constructive possession of the firearms. He also argues that even if the Government established constructive possession, the evidence showed that it was clearly improbable that the firearms were connected to his offense.

In order to justify an enhancement under § 2D1.1(b)(1), the Government "has the initial burden of showing by a preponderance of the evidence that the defendant possessed the firearm." *United States v. Ruiz Solorio*, 337 F.3d 580, 599 (6th Cir. 2003) (internal citation and quotation omitted). Possession can be actual or constructive. Constructive possession exists when a defendant "'knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.'" *United States v. Crumpton*, 824 F.3d

593, 609 (6th Cir. 2016) (quoting *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998)). "[N]onexclusive possession does not establish 'dominion over the premises' sufficient to show constructive possession." *United States v. Bailey*, 553 F.3d 940, 944 n.3 (6th Cir. 2009). However, constructive possession can be found where there is additional incriminating evidence showing the defendant knew of and controlled the contraband. *United States v. Wren*, 528 F. App'x 500, 506 (6th Cir. 2013) (citing *Bailey*, 553 F.3d at 944 n.3). Once possession is established, "[t]he burden then shifts to the defendant to demonstrate that it was clearly improbable that the weapon was connected to the offense." *Ruiz Solorio*, 337 F.3d at 599 (internal citation and quotations omitted). We review a district court's factual finding that the defendant possessed a firearm in connection with a drug crime for clear error. *United States v. Hough*, 276 F.3d 884, 894 (6th Cir. 2002).

Because McFarland was not arrested with actual possession of the firearms, the Government must show he constructively possessed the firearms. The Government has met this burden by proffering additional incriminating evidence connecting him to the firearms. McFarland leased the residence where the guns were found. His driver's license, computer, letters, clothes, and other personally belongings were found in the house, along with drugs and drug paraphernalia. All of this evidence establishes that McFarland knowingly had the power and intention to exercise dominion or control over the area where the firearms were found. *See Ruiz Solorio*, 337 F.3d at 599 (finding the Government met its burden of showing constructive possession where the defendant "leased the apartment where the guns were found").

McFarland argues that he did not constructively possess the firearms because they were hidden away in the attic. The location of these weapons does not change the court's analysis under this factual scenario. Considering that McFarland's name was on the lease and that his personal belongings were found throughout the residence, the evidence suggests that he could have

retrieved the weapons whenever he wanted. *See Hough*, 276 F.3d at 895 (noting that the defendant could have retrieved a gun located upstairs whenever he desired). Further, even if accessibility was limited, the firearms were found near drugs, and drugs were found throughout the house, including the kitchen and master bedroom. *See United States v. Edmonds*, 9 F. App'x 330, 332 (6th Cir. 2001) (upholding a firearms enhancement where "[a]lthough accessibility was limited by the lock on the safe, the revolver was not remote from paraphernalia and contraband seized from Edmonds's home"); *United States v. Greeno*, 679 F.3d 510, 515 (6th Cir. 2012) (upholding a § 2D1.1(b)(1) enhancement where "the firearms were found . . . in relatively close proximity to drugs and drug paraphernalia"). The evidence suggests that McFarland had dominion over the residence, including the attic.

McFarland also argues that he did not have exclusive dominion because Siegelman had as many belongings in the house as he did. However, the same neighbor who saw Siegelman frequenting the house also saw McFarland frequenting the house, as McFarland concedes. This, coupled with the various personal and illegal items found at the residence McFarland leased, provides sufficient incriminating evidence to show that McFarland knew of and controlled the weapons. "The weapons were in easy reach had [McFarland] wished to get them." *Hough*, 276 F.3d at 894 (rejecting defendant's argument that firearms located at his residence cannot be attributed to him because he did not exclusively reside in the home). Even if Siegelman also had access to the firearms, the law recognizes joint possession, which does not preclude a finding that McFarland constructively possessed the firearms. *United States v. Wheaton*, 517 F.3d 350, 367 (6th Cir. 2008).

McFarland has not met his burden of showing that it was clearly improbable that the two firearms were connected with the offense. *See Ruiz Solorio*, 337 F.3d at 599. McFarland argues

that because the firearms were found near heroin, they appear to have been connected to heroin, which McFarland was not charged with conspiring to distribute. But while McFarland was not convicted of trafficking heroin, the heroin in his attic was attributed to him for sentencing purposes. And the pistol was wrapped in the same packaging material used to seal drugs downstairs. The claim that the firearms were unrelated to McFarland's drug conspiracy is thus mere speculation, and McFarland must present evidence, not argument or speculation, to meet his burden. *Greeno*, 679 F.3d at 514. *See also Wheaton*, 517 F.3d at 368 ("The bare assertion of Wheaton's counsel that the gun might simply have been for the lawful purpose of defending the residence is insufficient to sustain Wheaton's burden of showing that it was 'clearly improbable' that the gun was related to the drug conspiracy."). Further, McFarland provided no evidence that the type of weapons found are clearly not the type of firearms typically associated with drug trafficking. *See* U.S.S.G. § 2D1.1 application note 11 (explaining that "the enhancement would not be applied if the defendant . . . had an unloaded hunting rifle in the closet"); *see also Edmonds*, 9 F. App'x at 332 (upholding a district court's decision to apply the enhancement in part because the defendant presented no evidence that the gun was "inoperable or an antique collectible"). McFarland failed to refute the Government's evidence, and the district court did not mistakenly apply the enhancement. *See Wheaton*, 517 F.3d at 367 ("A finding of fact is clearly erroneous when, although there may be some evidence to support the finding, the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed." (internal citation and quotation omitted)).

**B. Leadership Role Enhancement**

Next, McFarland argues that he should not have received a four-level increase in his base offense level under § 3B1.1(a) for his leadership role in a criminal enterprise. He argues that instead, a two-level increase under § 3B1.1(c) would have been more appropriate.

"Traditionally, legal conclusions are reviewed de novo and factual findings are reviewed for clear error." *United States v. Washington*, 715 F.3d 975, 982 (6th Cir. 2013). However, because the district court is best situated to legally conclude whether someone is a leader in a conspiracy under § 3B1.1, we grant this conclusion a deferential standard of review. *Id* at 983.

Under the Guidelines, a defendant's base offense level should be increased by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive[.]" U.S.S.G. § 3B1.1(a). McFarland argues that this enhancement is unwarranted because the district court did not justify its finding that McFarland led five or more people. However, as the Government notes, to qualify for this enhancement, McFarland only needed to have been the organizer or leader "of one or more other participants." U.S.S.G. § 3B1.1 application note 2. *See also United States v. Robinson*, 503 F.3d 522, 529, (6th Cir. 2007) ("[A] defendant whose sentence is enhanced under § 3B1.1(a) need only supervise or manage one of the five or more other participants."). Participants are persons, convicted or not, "who were [] aware of the criminal objective, and [] knowingly offered their assistance." *Id. See also* U.S.S.G. § 3B1.1 application note 1 ("A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted.").

As McFarland acknowledges in his briefing, his attorney at sentencing conceded that he exercised control over Fannin—a participant in the conspiracy—who he instructed to fly to LAX from Nashville with over $20,000. Further, as the Government highlights, McFarland was

convicted of a conspiracy to distribute controlled substances with four co-defendants. The district court erred in suggesting that McFarland needed to be the leader of five or more people to qualify for the enhancement. However, given McFarland's concession to being a leader of one individual in a conspiracy that involved at least six participants, under the plain language of the Guidelines, this error is harmless.

Accordingly, McFarland's argument fails, and we defer to the district court's decision to apply the enhancement.

**C. Criminal History Category**

McFarland next argues that his criminal history category under the Guidelines was overstated. Specifically, he argues that six criminal history points he received from two convictions in 1992 unfairly inflate his criminal history, unduly resulting in him earning a criminal history category of five.

As the Government notes, McFarland does not make clear whether he is seeking a downward departure under U.S.S.G. § 4A1.3(b)(1), or a variance under 18 U.S.C. § 3553(a). A "departure" refers to the imposition of a sentence outside of the calculated Guidelines range based on the district court's application of a particular Guidelines provision, whereas a "variance" refers to a sentence outside the Guidelines range based on the district court's consideration of one or more of the 18 U.S.C. § 3553(a) sentencing factors. *United States v. Grams*, 566 F.3d 683, 686–87 (6th Cir. 2009). Because McFarland discusses this argument while citing his Guidelines calculation in his briefing before the district court, we agree with the Government's position that McFarland appears to be requesting a departure under the Guidelines.

If reliable information suggests that a defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history, a downward departure may be

warranted. U.S.S.G. § 4A1.3(b)(1). "A district court's failure to grant a downward departure can only be reviewed by us upon appeal if the lower court erroneously believed that it lacked authority to grant such a departure as a matter of law." *United States v. Lucas*, 357 F.3d 599, 609 (6th Cir. 2004). "We do not require that a district court explicitly state that it is aware of its discretion to make such a departure. Rather, we presume that the district court understood its discretion, absent clear evidence to the contrary." *United States v. Santillana*, 540 F.3d 428, 431 (6th Cir. 2008) (internal citations omitted).

After hearing arguments from both parties, the district court denied McFarland's motion, finding that "the defendant's criminal history is not mitigated by the facts counsel has presented." There is no evidence that the district court was not aware it had the discretion to depart downward, so we decline to review its decision not to grant the departure.

McFarland argues that because the district court never mentioned "departure" in denying his motion, his request for departure was never ruled upon. He requests a plain error review of his criminal history. However, "we have not required that district courts carefully distinguish between whether the decision to deviate from the advisory Guidelines range is based on a departure or variance." *United States v. Herrera-Zuniga*, 571 F.3d 568, 586 (6th Cir. 2009). "[C]hoice of vocabulary is not dispositive" and instead "we must examine the transcript of the sentencing hearing to determine whether the court was aware of . . . its authority to vary from the Guidelines range." *United States v. Borden*, 365 F. App'x 617, 621 (6th Cir. 2010). Because the district court did vary from the Guidelines, it was clearly aware of its authority to do so. McFarland's argument fails.

**D. Reasonableness**

McFarland argues that in sentencing him, the district court did not meet the requirements of 18 U.S.C. § 3553. He argues that the district court did not adequately explain its reasoning for sentencing him below the Guidelines, or convey that it had considered McFarland's arguments at sentencing. Though unclear, it appears McFarland is challenging the reasonableness of his sentence, so we will treat his arguments as such.

A reasonableness inquiry has "both procedural and substantive components." *United States v. Jones*, 445 F.3d 865, 869 (6th Cir. 2006). A sentence may be procedurally unreasonable if "the district judge fails to 'consider' the applicable Guidelines range or neglects to 'consider' the other factors listed in 18 U.S.C. § 3553(a), and instead simply selects what the judge deems an appropriate sentence without such required consideration." *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005). Substantive reasonableness concerns whether a "sentence is too long (if a defendant appeals) or too short (if the government appeals)." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). "The point is not that the district court failed to consider a factor or considered an inappropriate factor; that's the job of procedural unreasonableness." *Id.* Rather, alleging substantive unreasonableness is "a complaint that the court placed too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual." *Id.*

"We review a district court's sentencing determination for reasonableness, using a deferential abuse-of-discretion standard." *United States v. Carson*, 560 F.3d 566, 585, (6th Cir. 2009). But when, as here, the district court asks the parties if there are any objections to its sentence and the parties raise none, we review the sentence for procedural reasonableness for plain error. *United States v. Bostic*, 371 F.3d 865, 872–73 (6th Cir. 2004). "A 'plain error' is an error that is clear or obvious, and if it affects substantial rights, it may be noticed by an appellate court."

*Id.* at 873 (internal citation omitted). Sentences within the Guidelines are presumptively reasonable. *United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir. 2008) (en banc). "[I]t follows from simple logic that a below-Guidelines sentence is presumed not to be unreasonably severe." *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008) (internal citations and quotations omitted).

1.  Procedural Reasonableness

McFarland argues that the district court inadequately explained the reasonings behind its sentence. This argument is a challenge to the procedural reasonableness of the sentence. *See Gall v. United States*, 552 U.S. 38, 51 (2007) (categorizing a "fail[ure] to adequately explain the chosen sentence" as a procedural error.). In fashioning a sentence, a district court should consider the nature and circumstances of the offense, the history and characteristics of the defendant, as well as the need for the sentence to reflect the seriousness of the offense, afford adequate deterrence, protect the public, and appropriately rehabilitate the defendant. 18 U.S.C. § 3553(a). A district court must state its reasonings for imposing its sentence, 18 U.S.C. § 3553(c), but does need not to "engage in a ritualistic incantation of the § 3553(a) factors it considers." *United States v. Chandler*, 419 F.3d 484, 488 (6th Cir. 2005) (internal citation and quotations omitted). Rather, a "sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 356 (2007).

We are satisfied that the district court had a reasoned basis for fashioning its sentence. At the sentencing hearing, the district court considered McFarland's history and characteristics by acknowledging McFarland's "very tough childhood," and recognized McFarland's "compassion for [his] son's illness." The district court considered the seriousness of McFarland's offense by

acknowledging that he put McFarland, Jr. and Siegelman, individuals he claimed to have cared for, in a "vulnerable" position as his co-defendants. In saying that McFarland's drug trafficking offense "affected a lot of lives" and "fed their addictions," the district court considered the need to protect the public from McFarland's further crimes. However, in analyzing the "totality of all the facts" and considering the witnesses' statements and the parties' arguments, the district court considered the possibility of McFarland coming out of prison a rehabilitated and "useful person." He recognized McFarland's "redeeming factors," and granted him a variance below the Guidelines. Analyzing the record as a whole, *Rita*, 551 U.S. at 359, the district court clearly explained why it chose its sentence, and incorporated McFarland's arguments for variance into its explanation. *See United States v. Bolds*, 511 F.3d 568, 580 (6th Cir. 2007) ("The district court must provide a clear explanation of why it has either accepted or rejected the parties' arguments and thereby chosen the particular sentence imposed, regardless of whether it is within or outside of the Guidelines."). McFarland's sentence is procedurally reasonable.

2. Substantive Reasonableness

McFarland also argues that the district court failed to give sufficient weight to the need to avoid unwarranted sentencing disparities, a § 3553(a) factor. Additionally, he questions whether a 200-month sentence for McFarland—who at the time was fifty-one years old—is sufficient but not greater than necessary to meet the goals of sentencing. These arguments are a challenge to the substantive reasonableness of the sentence. *See Jones*, 489 F.3d at 252; *United States v. Tristan-Madrigal*, 601 F.3d 629, 632–33 (6th Cir. 2010) ("The essence of a substantive-reasonableness claim is whether the length of the sentence is 'greater than necessary' to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a).").

In his motion for departure/variance, McFarland included a chart of dozens of cases in which defendants who were convicted of similar conduct were sentenced for less time than McFarland's Guidelines range. At sentencing, McFarland explained that drug quantity was previously measured by considering the weight of the active ingredient in the pill. In McFarland's case, drug quantity was calculated by considering the weight of the entire pill. McFarland contends that calculating drug quantity using the prior method would reduce his base offense level, thereby reducing his Guidelines range, which is a reason the district court should vary. The district court was correct in rejecting McFarland's request for variance based on a change in the way the Guidelines are calculated as "this is not the kind of disparity § 3553(a)(6) is after." *United States v. Bradley*, 897 F.3d 779, 786 (6th Cir. 2018). McFarland also notes that many of the cases he presented included doctors who received much lower sentences for distributing much higher pill quantities. However, as the Government argues, without considering details such as the defendants' criminal histories or possible cooperation with the Government, these cases do not provide much assistance. "Because [McFarland's] argument ultimately boils down to an assertion that the district court should have balanced the § 3553(a) factors differently [by placing more emphasis on the need to avoid unwanted sentencing disparities,] it is simply beyond the scope of our appellate review." *United States v. Sexton*, 512 F.3d 326, 332 (6th Cir. 2008).

McFarland's argument for variance based on his age also fails. "Although [McFarland] may have wanted the district court to show even greater leniency based on his age . . . the court's decision not to do so does not render the sentence unreasonable." *United States v. Wolcott*, 483 F. App'x 980, 989 (6th Cir. 2012). The district court's below-Guidelines sentence is not substantively unreasonably.

## III.

For the reasons stated above, we **AFFRIM** the district court's sentence.